## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| NORTH VALLEY GI MEDICAL GROUP, et al., | : | |
| | : | |
| Plaintiffs, | : | Case No. 1:15-cv-03268-JKB |
| | : | |
| v. | : | |
| | : | |
| PRUDENTIAL INVESTMENTS LLC, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT
## OF ITS MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

**KRAMON & GRAHAM, P.A.**
Geoffrey H. Genth, Bar No. 08735
William J. Harrington, Bar No. 03863
One South Street
Suite 2600
Baltimore, MD  21202
ggenth@kg-law.com
wharrington@kg-law.com
Tel.: (410) 752-6030
Fax: (410) 539-1269

**DECHERT LLP**
Matthew L. Larrabee (admitted *pro hac vice*)
David A. Kotler (admitted *pro hac vice*)
Deborah Kemi Martin (admitted *pro hac vice*)
Catherine V. Wigglesworth (admitted *pro hac vice*)
1095 Avenue of the Americas
New York, NY  10036-6797
matthew.larrabee@dechert.com
david.kotler@dechert.com
deborahkemi.martin@dechert.com
catherine.wigglesworth@dechert.com
Tel.: (212) 698-3500
Fax: (212) 698-3599

*Attorneys for Defendant Prudential Investments LLC*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND ........................................................................................6

I.     OVERVIEW OF THE MUTUAL FUND STRUCTURE ....................................6

     A.    The Mutual Fund And The Investment Adviser ....................................6

     B.    The "Manager of Managers" Model ......................................................6

     C.    The Independent Trustees ......................................................................8

II.    THE FUNDS AND THEIR MANAGEMENT ......................................................9

     A.    PI And The Subadvisers.........................................................................9

     B.    The Six Funds At Issue ........................................................................11

     C.    The Management Agreements ..............................................................12

     D.    The Subadvisory Agreements ..............................................................14

     E.    The SEC's Approval Of PI's "Manager of Managers" Structure..........15

III.   THE INDEPENDENT TRUSTEES' REVIEW AND APPROVAL OF THE
      MANAGEMENT AGREEMENTS ....................................................................16

     A.    The Funds' Independent Trustees And Their Independent Counsel ....................16

     B.    The Independent Trustees Requested And Evaluated All Information Relevant To
            Their Approval Of The Management Agreements ................................18

THE STANDARD ON THIS MOTION ....................................................................24

ARGUMENT ..............................................................................................................25

I.     PLAINTIFFS FALL WELL SHORT OF STATING A VIABLE SECTION 36(B)
      CLAIM UNDER THE STRINGENT *JONES* STANDARD ............................25

     A.    Plaintiffs Must Plausibly Allege Both The Arm's Length Bargaining Range For
            PI's Advisory Fees And That PI's Fees Fall Outside That Range.........................26

     B.    Plaintiffs Make No Allegations That PI's Fees Are Outside The Range Of Arm's-
            Length Bargaining ................................................................................27

          1.    Plaintiffs Fail To Make Any Fee Comparisons Establishing the Arm's-
                 Length Bargaining Range For PI's Fees.................................................. 27

i

2.    Plaintiffs Fail To Plead Any Facts Regarding the Funds' Performance In Comparison to Peer Funds .................................................................. 29

C.    Plaintiffs' Structural Attack On The "Manager Of Managers" Model Neither States A Section 36(b) Claim Nor Relieves Plaintiffs From The Requirement Of Satisfying The *Jones* Standard ............................................................. 31

D.    Plaintiffs' Remaining Allegations Are Equally Deficient ....................................... 34

1.    Plaintiffs' Allegation That PI Performed "Next To No Services" For The Funds Is Demonstrably False ................................................................. 34

2.    Plaintiffs Make No Allegations At All Regarding The Quality Of PI's Services ....................................................................................... 37

3.    Plaintiffs Make No Plausible Allegations That PI's Profitability Resulted In Excessive Fees ......................................................................... 37

4.    Plaintiffs' Conclusory "Economies Of Scale" Allegations Are Legally Deficient ..................................................................................... 38

II.   PLAINTIFFS OFFER NO BASIS TO OVERTURN THE INDEPENDENT TRUSTEES' BUSINESS JUDGMENT IN APPROVING THE FUNDS' MANAGEMENT AGREEMENTS WITH PI .................................................................................. 40

A.    Plaintiffs Seeking To Overturn The Independent Trustees' Business Judgment Bear A Heavy Burden ............................................................. 40

B.    Plaintiffs Do Not Plausibly Challenge The Statutory Independence Of The Funds' Independent Trustees ................................................................. 42

C.    Plaintiffs Also Fail To Plausibly Allege That The Independent Trustees' Review Was Not Rigorous and Thorough ................................................. 43

CONCLUSION ................................................................................................. 47

## TABLE OF AUTHORITIES

CASES

*Am. Chem & Equip. Inc. 401(K) Ret. Plan v. Principal Mgmt. Corp.,*
    2014 WL 5426908 (S.D. Iowa Sept. 10, 2014) ........................................................33

*Amron v. Morgan Stanley Inv. Advisors, Inc.,*
    464 F.3d 338 (2d Cir. 2006)............................................................... *passim*

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..........................................................................1, 24

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)........................................................................24, 34

*Burks v. Lasker,*
    441 U.S. 471 (1979)........................................................................5, 8, 9

*Curd v. SEI Invs. Mgmt. Corp.,*
    2015 WL 4243495 (E.D. Pa. July 14, 2015).................................................33

*Dodson Ins. Brokerage of TX, LLC v. Indem. Ins. Corp., RRG,*
    No. CIV. WDQ-12-1606, 2013 WL 709644 (D. Md. Feb. 25, 2013) ......................2

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,*
    528 F. Supp. 1038 (S.D.N.Y. 1981), *aff'd,* 694 F.2d 923 (2d Cir. 1982)...................25, 27, 39

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,*
    573 F. Supp. 1293 (S.D.N.Y. 1983)........................................................37

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,*
    694 F.2d 923 (2d Cir. 1982).................................................................27

*Hoffman v. UBS-AG,*
    591 F. Supp. 2d 522 (S.D.N.Y. 2008)....................................................39, 43

*In re AllianceBernstein Mut. Fund Excessive Fee Litig.,*
    2006 WL 74439 (S.D.N.Y. Jan. 11, 2006) ..................................................43

*In re Am. Mut. Funds Fee Litig.,*
    2009 WL 5215755 (C.D. Cal. Dec. 28, 2009), *aff'd sub nom. Jelinek v. Capital
    Research & Mgmt. Co.,* 448 F. App'x 716 (9th Cir. 2011) ............................. *passim*

*In re Eaton Vance Mut. Funds Fee Litig.,*
    380 F. Supp. 2d 222 (S.D.N.Y. 2005)......................................................42

*In re Franklin Mut. Funds Fee Litig.*,
478 F. Supp. 2d 677 (D.N.J. 2007) ...................................................................45

*In re Goldman Sachs Mut. Funds*,
2006 WL 126772 (S.D.N.Y. Jan. 16, 2006) .......................................................39

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
351 F. Supp. 2d 334 (D. Md. 2004) ....................................................................2

*In re Scudder Mut. Funds Fee Litig.*,
2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007) ....................................................39

*Jones v. Harris Assocs. L.P.*,
559 U.S. 335 (2010) .............................................................................. passim

*Jones v. Harris Assocs. LP*,
611 F. App'x 359 (7th Cir. 2015) ........................................................... passim

*Kalish v. Franklin Advisers, Inc.*,
742 F. Supp. 1222 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991) ...................29, 31, 38

*Kasilag v. Hartford Inv. Fin. Servs. LLC*,
2012 WL 6568409 (D.N.J. Dec. 17, 2012) .........................................................33

*Katyle v. Penn Gaming, Inc.*,
637 F.3d 462 (4th Cir. 2011) ...............................................................................2

*Krantz v. Prudential Invs. Fund Mgmt. LLC*,
305 F.3d 140 (3d Cir. 2002) ...............................................................................42

*Krinsk v. Fund Asset Mgmt., Inc.*,
1986 WL 205 (S.D.N.Y. May 9, 1986) ...........................................................25, 37

*Krinsk v. Fund Asset Mgmt., Inc.*,
875 F.2d 404 (2d Cir. 1989) ...............................................................................29

*McCleary-Evans v. Maryland Dept. of Transp.*,
780 F.3d 582 (4th Cir. 2015) ..............................................................................24

*Migdal v. Rowe-Price Fleming Int'l, Inc.*,
2000 WL 350400 (D. Md. Mar. 20, 2000), *aff'd*, 248 F.3d 321 (4th Cir. 2001)...............42, 44

*Migdal v. Rowe-Price Fleming Int'l, Inc.*,
248 F.3d 321 (4th Cir. 2001) ...................................................................., *passim*

*Redus-Tarchis v. New York Life Inv. Mgmt., LLC*,
2015 WL 6525894 (D.N.J. Oct. 28, 2015).........................................................33

*Sloan v. Maryland Div. of Corr.*,
  No. CIV.A JKB-14-1396, 2015 WL 300407 (D. Md. Jan. 21, 2015) ....................................24

*Strougo v. BEA Assocs.*,
  188 F. Supp. 2d 373 (S.D.N.Y. 2002).................................................................................28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..............................................................................................................2

*Turner v. Davis Selected Advisers LP*,
  2015 WL 5692324 (9th Cir. Sept. 29, 2015) ..................................................................3, 28

*Veney v. Wyche*,
  293 F.3d 726 (4th Cir. 2002) ...............................................................................................34

*Verkouteren v. Blackrock Fin. Mgmt., Inc.*,
  1999 WL 511411 (S.D.N.Y. July 20, 1999).........................................................................44

*Watson v. Stouffer*,
  No. CIV.A. JKB-13-3605, 2015 WL 412041 (D. Md. Jan. 29, 2015) ...............................24

*Zehrer v. Harbor Capital Advisors, Inc.*,
  2014 WL 6478054 (N.D. Ill. Nov. 18, 2014) ......................................................................33

**STATUTES**

15 U.S.C. § 80a-1 *et seq.* ...................................................................................... *passim*

15 U.S.C. § 80a-2 ....................................................................................................8, 42

15 U.S.C. § 80a-10 ........................................................................................................8

15 U.S.C. § 80a-15.................................................................................................9, 15, 46

15 U.S.C. § 80a-35.................................................................................................25, 40

**OTHER AUTHORITIES**

1 Clifford E. Kirsch, Mutual Funds and Exchange Traded Funds Regulation § 6 ..........................7

2 Clifford E. Kirsch, Mutual Funds and Exchange Traded Funds Regulation § 42 ........................7

*Advanced Series Trust et al. Notice of Application*,
  SEC Rel. No. IC-31342, 2014 WL 6601015 (Nov. 20, 2014)..............................15, 16, 32, 36

*In re Advanced Series Trust et. al*,
  SEC Rel. No. IC-31377, 2014 WL 7166465 (Dec. 16, 2014) ................................................16

*In re Morgan Stanley Inv. Mgmt., Inc.*,
  Inv. Co. Act of 1940 Rel. No. 29862, 2011 WL 5562535 (Nov. 16, 2011) .........................8, 36

*In re Target Portfolio Trust Prudential Mut. Fund Mgmt., Inc.*,
  SEC Rel. No. IC-22215, 1996 WL 517229 (Sept. 11, 1996) ....................................................15

*In re Virtus Inv. Advisers, Inc.*,
  Inv. Co. Act of 1940 Rel. No. 31901, 2015 WL 7179719 (Nov. 16, 2015) .........................8, 36

Independent Directors Council, Board Oversight of Subadvisers Task Force Report (Jan.
  2010), *available at* https://www.idc.org/pdf/idc_10_subadvisers.pdf.....................................7

Investment Company Institute, 2015 Investment Company Fact Book (2015), *available at*
  http://www.ici.org/pdf/2015_factbook.pdf. ...............................................................................6

Remarks by Chairman Arthur Levitt, U.S. Securities & Exchange Comm'n, Investment
  Company Institute, May 15, 1998, *available at*
  https://www.sec.gov/news/speech/speecharchive/1998/spch212.txt.........................................9

S. Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897 (1970) ......................32, 37, 41

## INTRODUCTION

Plaintiffs, who claim to be shareholders of six mutual funds,[1] allege that the Funds' investment adviser, Prudential Investments LLC ("PI"), breached a fiduciary duty imposed by Section 36(b) of the Investment Company Act of 1940 (the "ICA") by charging the Funds "excessive" advisory fees. Under controlling Supreme Court precedent, to state this claim, Plaintiffs must plead facts sufficient to support a conclusion that PI has charged "a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."[2] Plaintiffs' Complaint suffers from a series of fatal flaws, which causes it to fall well short of this stringent standard.

Most fundamentally, Plaintiffs' Complaint fails because it does not allege any facts showing that PI's fees are outside the range that could have been produced by "arm's-length bargaining." The Supreme Court's ruling in *Jones* "does not allow a court to assess the fairness or reasonableness of advisers' fees; the goal is to identify the outer bounds of arm's length bargaining and not engage in rate regulation."[3] As a matter of both law and logic, the fees "produced by bargaining at other mutual fund complexes. . . tells us the bargaining range."[4] Yet, Plaintiffs set forth no facts about the fees paid by comparable mutual funds. They therefore do

---

[1]    Those six mutual funds (the "Funds") are the Prudential Jennison Growth Fund ("Growth Fund"), a series of Prudential Investment Portfolios Inc.; the Prudential Jennison Mid-Cap Growth Fund Inc. ("Mid-Cap Growth Fund"); the Prudential Global Real Estate Fund ("Global Real Estate Fund"), a series of Prudential Investment Portfolios Inc. 12; the Prudential Jennison Equity Income Fund ("Equity Income Fund"), a series of Prudential Investment Portfolios Inc. 10; the Prudential Short-Term Corporate Bond Fund Inc. ("Short-Term Corp. Bond Fund"); and the Prudential Jennison Natural Resources Fund Inc. ("Natural Resources Fund").

[2]    *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 346 (2010) ("*Jones I*"); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[3]    *Jones v. Harris Assocs. LP*, 611 F. App'x 359, 360-61 (7th Cir. 2015) ("*Jones II*") (emphasis added). This opinion is an "order" that is appropriately cited. *See* 7th Cir. L.A.R. 32.1(b).

[4]    *Jones II*, 611 F. App'x at 361.

not establish the "bargaining range" for PI's fees with respect to any of the Funds in suit, much less that PI's fees are outside this critical range. The Complaint fails for this reason alone.

This omission is no oversight, because the indisputable fact is that PI's fees are squarely within the "bargaining range" of advisory fees charged to comparable mutual funds. As confirmed by an independent and well-recognized industry source, the management fees charged by PI to each Fund are <u>below</u>—and in most instances well below—the average of those charged to the Fund's peer group.[5] Also beyond dispute is that these comparatively low fees have earned Fund investors performance that is <u>above</u>—and in most instances well above—that achieved by those same peer groups. Put differently, PI "delivered value for money; the funds it was advising did as well as, if not better than, comparable funds."[6] No court has ever held that an adviser who charges below-average fees and delivers above-average performance is nonetheless guilty of charging "excessive" fees in violation of Section 36(b). To the contrary, the appellate courts that

---

[5]     As discussed in each Fund's required SEC filings, the Board of Trustees of each Fund consulted a comparison prepared by Lipper Inc., a noted and independent source of mutual fund data. *See In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755, at *25 (C.D. Cal. Dec. 28, 2009), *aff'd sub nom. Jelinek v. Capital Research & Mgmt. Co.*, 448 F. App'x 716 (9th Cir. 2011) (noting that "Lipper, Inc. ('Lipper') is a recognized industry-leading third-party source for mutual fund industry data."). For each Fund, Lipper ranked PI's fee by comparing it to the fees charged to mutual funds in a similar peer group and peer universe. *See infra* Part III.B.

The factual information referenced in this memorandum regarding the Funds, PI and the subadvisers is drawn from publicly-available materials, such as the Funds' websites, and from required SEC filings made by the Funds and/or PI. Plaintiffs' Complaint expressly acknowledges its reliance on these and other publicly-available materials regarding PI and the Funds. Compl. preamble at 1. The Court therefore may take judicial notice of these materials on this motion. *See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (in ruling on motion to dismiss, courts may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *Katyle v. Penn Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011) (same); *Dodson Ins. Brokerage of TX, LLC v. Indem. Ins. Corp., RRG*, No. CIV. WDQ-12-1606, 2013 WL 709644, at *1 n.1 (D. Md. Feb. 25, 2013) ("In reviewing the motion to dismiss, the Court may consider allegations in the [complaint], matters of public record, and documents attached to the motion to dismiss that are integral to the [complaint] and authentic."); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 349 (D. Md. 2004) (In considering motion to dismiss complaint, "the Court is entitled to rely on public documents quoted by, relied upon, incorporated by reference or otherwise integral to the complaint, and such reliance does not convert such a motion into one for summary judgment.").

[6]     *Jones II*, 611 F. App'x at 361.

2

have interpreted the *Jones* standard have: (a) held that below-average fees and above-average performance alone show that an adviser's fees could <u>not</u> be "excessive" in violation of Section 36(b); and (b) affirmed the dismissal of complaints that failed to set forth facts relating to the fees paid and performance achieved by comparable mutual funds.[7]  Given PI's lower fees and superior performance, Plaintiffs cannot allege facts that support a plausible inference that PI's fees were excessive.

Unable to meet the Supreme Court's requirement that they plead the "bargaining range" for PI's fees, Plaintiffs instead attack the structure of the "manager of managers" investment advisory model used by PI and many other fund complexes.  This tactic, however, is also flawed because such an attack is not a viable alternative for alleging facts showing that PI's fees are beyond the range of arm's-length bargaining.  As a threshold matter, Plaintiffs' insinuation that PI's advisory fees are excessive because they consist of more than just the fees charged by the Funds' subadvisers fails as a matter of law.  Advisory services differ fundamentally from subadvisory services, and the Supreme Court has warned against the use of such "inapt comparisons" based on "significant differences between the services provided."[8]  As the Supreme Court specifically cautioned, Section 36(b) is "sharply focused on the question of whether <u>the fees themselves were excessive</u> . . .,"[9] not on extraneous allegations challenging the propriety of a particular investment approach.

Moreover, there is nothing inherently wrong with the "manager of managers" industry model, which offers investors a range of valuable benefits.  In fact, the "manager of managers"

---

[7]     *Id.*; *Turner v. Davis Selected Advisers LP*, 2015 WL 5692324 (9th Cir. Sept. 29, 2015).

[8]     *Jones II*, 611 F. App'x at 360.

[9]     *Jones I*, 559 U.S. at 352 (quoting *Migdal v. Rowe-Price Fleming Int'l, Inc.*, 248 F.3d 321, 328 (4th Cir. 2001)) (emphasis added).

model:  (a) has been approved more than 200 times by the Securities and Exchange Commission ("SEC")—the regulatory body charged with enforcing the ICA—for investment advisers of all shapes and sizes, including for PI in 1996 and again in 2014; and (b) has been employed for years by PI, with indisputable success for Plaintiffs and the Funds' tens of thousands of other shareholders.  Plaintiffs' invective about PI's "manager of managers" platform, in the absence of the necessary facts about the "bargaining range" for PI's fees, cannot state a Section 36(b) claim.

Similarly, Plaintiffs' vague and generalized allegation that PI's fees are *per se* excessive because PI itself "performed almost no services" for the Funds while delegating "substantially all" of its responsibilities to the Funds' subadvisers also fails to save their claim.  Indeed, the sparse facts Plaintiffs proffer in support of their allegation are demonstrably false, as proven by the very documents on which the Complaint is built.[10]  For example, the Management Agreements referenced in the Complaint, which were filed with the SEC and are available to the Funds' shareholders (and therefore part of the pre-filing "investigation conducted by and through Plaintiffs' counsel"[11]), detail the numerous responsibilities that PI undertakes notwithstanding its retention of a subadviser.  Plaintiffs' false conclusion that PI performs "almost no services" for the Funds cannot paper over the critical holes in their claim.

Finally, Plaintiffs fail to allege a plausible basis to rebut the deference that the Supreme Court requires be accorded to the approval of the Management Agreements (which includes PI's fees) by the Funds' Independent Trustees.  In the words of the Supreme Court, the independent trustees who sit on a mutual fund's board function as the "watchdogs" of the relationship

---

[10]    *E.g.*, Compl. ¶¶ 3, 45, 51.

[11]    *Id.*, preamble at 1.

between the fund and the investment adviser.[12]  Respecting this watchdog role, the Supreme

Court has ruled that if the trustees are independent and have engaged in a thorough process to

determine the propriety of the fee arrangement between the adviser and the fund, courts should

not second-guess their business judgment or replace them with judicial evaluations of the

"reasonableness" of adviser fees.[13]  To the contrary, the Supreme Court has instructed the

judiciary to afford "considerable weight" to such trustee judgments.[14]

Here, the Funds' Independent Trustees, after an intensive and rigorous process guided by

sophisticated independent counsel and informed by comprehensive materials relating to the

services provided to the Funds, arrived at what they concluded were reasonable fee arrangements

with PI.[15]  Despite this ineluctable fact, Plaintiffs seek to have the Court not only insert itself in

the board room of the indisputably qualified, informed and conscientious Independent Trustees

but also to countermand their considered business judgment.  Once again, the only factual

allegation Plaintiffs offer in support of this claim—that the Independent Trustees did not

consider "fee rates negotiated by other mutual funds"[16]—is demonstrably false; the public

disclosures on which the Complaint relies make clear that the Trustees considered this very

information.  The Court should reject Plaintiffs' invitation to "second-guess" the Trustees'

decision to approve the below-market rate advisory fees charged by PI to manage these well-

performing mutual funds.

---

[12]     *Burks v. Lasker*, 441 U.S. 471, 481 (1979).

[13]     *Jones I*, 559 U.S. at 352.

[14]     *Id.* at 351.

[15]     *See* pp. 18-23, *infra*.

[16]     Compl. ¶ 76.

Plaintiffs fail to state a viable Section 36(b) claim against PI under the Supreme Court's *Jones* standard.  The Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND

### I.   OVERVIEW OF THE MUTUAL FUND STRUCTURE

#### A.   The Mutual Fund And The Investment Adviser

A mutual fund is a "pool of assets, consisting primarily of [a] portfolio [of] securities, and belonging to the individual investors holding shares in the fund."[17]  Mutual funds are regulated by the ICA.[18]  A mutual fund "has no employees in the traditional sense"; rather, it relies on third parties "to invest fund assets and carry out other business activities."[19]

Typically, "[a] separate entity called an investment adviser creates the mutual fund . . . ."[20]  The adviser, which must register with the Securities and Exchange Commission ("SEC"), also has "overall responsibility for directing the fund's investments and handling its business affairs."[21]  In return for managing the fund and bearing all of the attendant risks (including whether it will be able to recoup the substantial costs associated with launching the fund), the adviser receives a fee, often calculated as a percentage of the net assets of the fund and measured in "basis points" (one basis point equals one hundredth of one percent).

#### B.   The "Manager of Managers" Model

To execute its responsibility to direct the funds' investments and oversee the funds' business affairs, an adviser may directly employ individual professionals tasked with selecting

---

[17]   *Jones I*, 559 U.S. at 338.

[18]   *See* 15 U.S.C. § 80a-1 *et seq.*

[19]   Investment Company Institute, 2015 Investment Company Fact Book (2015) at 245 ("2015 ICI Fact Book"), *available at* http://www.ici.org/pdf/2015_factbook.pdf.

[20]   *Jones I*, 559 U.S. at 338.

[21]   2015 ICI Fact Book at 247.

the particular securities owned by the mutual fund on behalf of the fund's shareholders (along with all of the other personnel needed to manage a mutual fund, such as compliance, legal, accounting, and marketing/distribution departments). A well-recognized alternative to this approach, however, is often referred to as a "manager of managers" structure, in which the investment adviser "maintains overall responsibility for the management of the fund . . . but allocates management of some or all of the assets of the fund to one of more subadvisers."[22] Investment advisers employ the "manager of managers" structure for a variety of reasons, including that a subadviser may "have an investment focus, style, or objective beyond the particular expertise of the investment adviser's existing staff, helping the investment adviser to fill in gaps in its existing suite of funds without the need for extensive new resources."[23] The "manager of managers" model is quite common in the mutual fund industry: since 1995, the SEC has issued over 200 exemptive orders permitting investment advisers to utilize this model by retaining subadvisers without requiring shareholder approval.[24] As of April 2009, nearly 40 percent of mutual funds retained at least one subadviser.[25]

Employing the "manager of managers" model does not excuse the adviser from its duty to supervise and oversee the services provided by the fund's subadvisers—a duty that is anything but illusory. To the contrary, the adviser retains both responsibility for the overall management of the mutual fund and the ultimate legal and regulatory risk of managing the fund. The SEC's pursuit of enforcement actions against advisors based on investment strategies run entirely by

---

[22]    1 Clifford E. Kirsch, Mutual Funds and Exchange Traded Funds Regulation § 6 (3d ed. 2013).

[23]    2 Clifford E. Kirsch, Mutual Funds and Exchange Traded Funds Regulation § 42 (3d ed. 2013).

[24]    Independent Directors Council, Board Oversight of Subadvisers Task Force Report (Jan. 2010) at 2, *available at* https://www.idc.org/pdf/idc_10_subadvisers.pdf.

[25]    *Id.*

subadvisers[26] and on subadvisers' failure to provide the contracted-for services to the fund[27] highlights the significant responsibility borne by the adviser.

### C.  The Independent Trustees

A mutual fund (including one that employs the "manager of managers" model) is overseen by a board of trustees.[28]  A central aspect of the ICA is its requirement that at least 40 percent of a mutual fund's board be independent (as defined by the ICA).[29]  This independence requirement is the "cornerstone of the ICA's effort to control conflicts of interest within mutual funds."[30]  Importantly, fund trustees who meet the statutory definition of independence are presumed by the ICA to be independent.[31]

A fund's independent trustees are entrusted with protecting the interests of the fund in its relationship with the fund's investment adviser.  As the Supreme Court has explained, the ICA was designed to ensure that the independent trustees serve as "independent watchdogs" who "furnish an independent check upon the management of investment companies."[32]  Indeed, "the structure and purpose of the ICA indicate that Congress entrusted to the independent directors of investment companies, exercising the authority granted to them by state law, the primary

---

[26]     *In re Virtus Inv. Advisers, Inc.*, Inv. Co. Act of 1940 Rel. No. 31901, 2015 WL 7179719 (Nov. 16, 2015).

[27]     *In re Morgan Stanley Inv. Mgmt., Inc.*, Inv. Co. Act of 1940 Rel. No. 29862, 2011 WL 5562535 (Nov. 16, 2011).

[28]     *See* 15 U.S.C. § 80a-10(a).

[29]     *Id.*; *see* 15 U.S.C. § 80a-2(a)(19) (defining independence under the ICA).

[30]     *Burks*, 441 U.S. at 482.

[31]     15 U.S.C. § 80a-2(a)(9); *see Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 344 (2d Cir. 2006) ("the 40 Act contains an express presumption that mutual fund trustees and natural persons who do not own 25% of the voting securities are disinterested").

[32]     *Burks*, 441 U.S. at 484.

responsibility for looking after the interests of the funds' shareholders."[33]  The ICA therefore

gives independent trustees "a host of special responsibilities," including that "they must review

and approve the contracts of the investment adviser annually, and a majority of these directors

must approve an adviser's compensation."[34]

In performing their statutory responsibility with respect to the review and approval of an

adviser's agreement with the fund, the trustees must "request and evaluate, and [it is] the duty of

an investment adviser to such company to furnish, such information as may reasonably be

necessary to evaluate" the agreement.[35]  After requesting, receiving and evaluating such

information, the trustees must exercise their business judgment regarding whether approval of

the management agreement is in the best interests of the fund and its shareholders.  In this

regard, the role of the trustees is <u>not</u> to "guarantee that a fund pays the lowest rates,"[36] but rather

to ensure that fees fall within the arm's length range as mandated by the Supreme Court in *Jones*.

## II.     THE FUNDS AND THEIR MANAGEMENT

### A.     PI And The Subadvisers

PI, an SEC-registered investment adviser, advises 65 different retail mutual funds,

including the six Funds presently at issue.[37]  PI was formed in 1996; along with its predecessor

---

[33]     *Id.* at 484-85.

[34]     *Jones I*, 559 U.S. at 340.

[35]     15 U.S.C. § 80a-15(c).

[36]     Remarks by Chairman Arthur Levitt, U.S. Securities & Exchange Comm'n, Investment Company Institute, May 15, 1998, *available at* https://www.sec.gov/news/speech/speecharchive/1998/spch212.txt.

[37]     Prudential Investments LLC (Dec. 2015), https://investment.prudential.com/wps/portal/pipub/!ut/p/b0/04_Sj9CPykssy0xPLMnMz0vMAfIjS4tych MLrNJK81KK9fILUvNS81IgHDBZUJSflpmTagXUpBdioh- uH6UfVZCYnuqZoh9pbmqhX5Cb6wgAjnCX2g!!/#.

9

companies, PI has advised Prudential-sponsored mutual funds since 1987.[38]  All told, tens of

thousands of mutual fund investors presently have entrusted more than $74 billion of their

money with PI.[39]

In connection with its duties as adviser to the six Funds at issue, PI has retained three

subadvisers to assist it in providing services to the Funds:

- Jennison Associates LLC ("Jennison"), an SEC-registered investment adviser, serves as subadviser to the Growth Fund, the Mid-Cap Growth Fund, the Equity Income Fund, and the Natural Resources Fund.[40]

- Prudential Investment Management Inc. ("PIM"), an SEC-registered investment adviser, serves as subadviser to the Short-Term Corporate Bond Fund.[41]

- Prudential Real Estate Investors ("PREI"), the real estate investment advisory unit of PIM, serves as subadviser to the Global Real Estate Fund.[42]

All three subadvisers are corporate affiliates of PI.[43]

---

[38]    Prudential Investments LLC, Form ADV Part 2A at 4 (Aug. 25, 2015), *available at* http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=33 9066; *see, e.g.*, Growth Fund Prospectus at 15 (Nov. 25, 2014), *available at* https://www.sec.gov/Archives/edgar/data/949512/000006759014001316/pipinc485bcoverpage.htm#1bb3 04a7-1bdf-4277-9b4b-c6e608037c43_3.

[39]    *Who We Are*, Prudential Investments LLC (Dec. 31, 2014), *available at* https://investment.prudential.com/wps/portal/pipub/!ut/p/b0/04_Sj9CPykssy0xPLMnMz0vMAfIjS4tych MLrBKT8ktLSov1yjPyE4tSy1OtgKr0Qkz0w_Wj9KMKEtNTPVP0I40NLEzM9Atycx0BEESSKw!!/.

[40]    Jennison Associates LLC Form ADV Part 2A at 1, 26 (Mar. 31, 2015), *available at* http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=30 7879.

[41]    Prudential Fixed Income Form ADV Part 2A at 4, 19-20 (Jan. 12, 2016), *available at* http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=35 0953.  Effective January 4, 2016, PIM's name changed to PGIM, Inc.  *Id.* at ii.

[42]    PREI Form ADV Part 2A at 1-3 (Jan. 12, 2016), *available at* http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=35 0955.

[43]    Both PI and each of these subadvisers are indirect, wholly-owned subsidiaries of Prudential Financial, Inc.  PI Form ADV Part 2A at 4; Jennison Form ADV Part 2A at 1; Prudential Fixed Income Form ADV Part 2A at 4; PREI Form ADV Part 2A at 1.

Both the subadvisory relationship between each of the subadvisers and the Funds, as well as the corporate affiliation between the subadvisers and PI, are fully disclosed in the Funds' SEC filings and in materials routinely sent to the Funds' shareholders and Boards.[44]

### B.    The Six Funds At Issue

Each of the six Funds in suit is organized as a series of an open-end investment management company registered under the ICA and incorporated under state law,[45] and each follows a distinct investment strategy.  Hence:

- The Growth Fund "[s]eeks to provide long-term growth of capital by investing primarily in larger-cap stocks believed to have sustainable, above-market growth in revenues, earnings, and cash flows."[46]

- The Mid-Cap Growth Fund "[s]eeks long-term growth of capital by investing in attractively-priced mid-size companies with the potential to produce above-average earnings growth."[47]

- The Equity Income Fund "[s]eeks income and capital appreciation by investing in companies with the ability to sustain and increase dividends that may be undervalued by the market."[48]

- The Natural Resources Fund "[s]eeks long-term capital growth by investing in companies that own, explore, mine, process, and develop natural resources commodities."[49]

---

[44]    2014 Growth Fund Annual Report ("AR") at 29-30 (Ex. 1); 2015 Mid-Cap Growth Fund AR at 31-32 (Ex. 2); 2014 Equity Income Fund AR at 35-36 (Ex. 3); 2014 Natural Resources Fund AR at 33-34 (Ex. 4); 2014 Short Term Corp. Bond Fund AR at 62-63 (Ex. 5); Sept. 2014 Global Real Estate Fund Semi-Annual Report ("SAR") at 27-28 (Ex. 6); Jennison Associates Form ADV Part 2A at 26; Prudential Fixed Income Form ADV Part 2A at 19; PREI Form ADV Part 2A at 2.

[45]    Compl. ¶¶ 15-20.

[46]    Fact Sheet, Prudential Jennison Growth Fund (Dec. 31, 2015), *available at* https://investment.prudential.com/util/common/get?file=D951ABD30BFD3CE285257B7D005CD8CE.

[47]    Fact Sheet, Jennison Mid-Cap Growth Fund (Dec. 31, 2015), *available at* https://investment.prudential.com/util/common/get?file=DF4CE7B6BF6B868585257B7D005CF404.

[48]    Fact Sheet, Jennison Equity Fund (Dec. 31, 2015), *available at* https://investment.prudential.com/util/common/get?file=B7D31845D52BE59085257B7D005CC690.

[49]    Fact Sheet, Jennison Natural Resources Fund (Dec. 31, 2015), *available at* https://investment.prudential.com/util/common/get?file=E8F450DBB8FB04C685257B7D005CFD09.

- The Global Real Estate Fund "[s]eeks to provide capital appreciation and income by investing primarily in domestic and international real estate securities."[50]

- The Short Term Corporate Bond Fund "[s]eeks high current income consistent with the preservation of principal by investing at least 80% of its assets in corporate bonds."[51]

## C.    The Management Agreements

PI provides services to the Funds pursuant to the terms of a Management Agreement entered into with each Fund that, as Plaintiffs appropriately recognize, "detail[s] the parties' obligations."[52]   Critically, the Management Agreements each explicitly impose upon PI alone full responsibility for all aspects of the management of the Funds, notwithstanding the retention of the subadvisers.  These facts are wholly ignored in the Complaint.

For instance, each Management Agreement requires PI to:

- "manage the investment operations of" each fund in accordance with its investment objectives, policies and restrictions;

- "periodically report to the Fund's Board regarding the results of its evaluation and monitoring functions;"

- "prepare and file (or cause to be prepared and filed) such reports as are, or may in the future be, required by the SEC;"

- "render periodic and special reports as requested by the Fund's Board of Directors;" and

- "provide the Fund's Custodian on each business day information relating to all transactions concerning the Fund's assets."[53]

---

[50]     Fact Sheet, Prudential Global Real Estate Fund (Dec. 31, 2015), *available at* https://investment.prudential.com/util/common/get?file=A289BC20523295E985257B7D005C6257.

[51]     Fact Sheet, Short Term Corp. Bond Fund (Dec. 31, 2015), *available at* https://investment.prudential.com/util/common/get?file=090B7BDFF225F13885257B7D005DB648.

[52]     Compl. ¶ 25.

[53]     Growth Fund Management Agreement ("MA") at 2-3; Mid-Cap Growth Fund MA at 1-3; Global Real Estate Fund MA at 1-3; Equity Income Fund MA at 1, 4; Short-Term Corp. Bond Fund MA at 1-3; Natural Resources Fund MA at 1-3.  The Growth Fund Management Agreement, which Plaintiffs concede is "substantially the same" as the Management Agreements for the other Funds, Compl. ¶ 26 n.13, is

Furthermore, the Management Agreements each expressly permit PI to "enter into a subadvisory agreement with" one or more subadvisers, subject to the approval of the Fund's Board of Directors.[54]  Once PI retains a subadviser, the Management Agreements each require PI to "(i) continually evaluate the performance of the Subadviser . . .; (ii) periodically make recommendations to the Fund's Board as to whether the contract with one or more Subadvisers should be renewed, modified, or terminated; and (iii) periodically report to the Fund's Board regarding the results of its evaluation and monitoring functions."[55]  Again, critically, the Management Agreements each provide that PI "will continue to have responsibility for all investment advisory services furnished pursuant to any Subadvisory Agreement."[56]

The Management Agreements also require that PI perform a number of administrative functions, including to "administer the Fund's business affairs"; "furnish the Fund with office facilities and with clerical, bookkeeping and recordkeeping services at such office facilities"; "maintain all books and records with respect to the Fund's portfolio transactions"; and "be responsible for the financial and accounting records to be maintained by the Fund[.]"[57]  Under the Management Agreements, none of these responsibilities may be transferred to the subadviser.

---

attached as Ex. 7.  PI would be pleased to supply the Management Agreements for the other Funds at the Court's request.

[54]      Growth Fund MA at 1; Mid-Cap Growth Fund MA at 1; Global Real Estate Fund MA at 1; Equity Income Fund MA at 1; Short-Term Corp. Bond Fund MA at 1; Natural Resources Fund MA at 1.

[55]      Growth Fund MA at 1; Mid-Cap Growth Fund MA at 1; Global Real Estate Fund MA at 1; Equity Income Fund MA at 2; Short-Term Corp. Bond Fund MA at 1; Natural Resources Fund MA at 1.

[56]      Growth Fund MA at 1; Mid-Cap Growth Fund MA at 1; Global Real Estate Fund MA at 1; Short-Term Corp. Bond Fund MA at 1; Natural Resources Fund MA at 1; *see* Equity Income Fund MA at 1 (providing that PI will have "responsibility to the Fund and each Portfolio for all investment advisory services furnished to the Fund and such Portfolio pursuant to any Subadvisory Agreement").

[57]      Growth Fund MA at 2-3; Mid-Cap Growth Fund MA at 2-3; Global Real Estate Fund MA at 1, 3; Equity Income Fund MA at 2, 4; Short-Term Corp. Bond Fund MA at 1-2; Natural Resources Fund MA at 2-3.

### D.   The Subadvisory Agreements

Each of the Management Agreements between PI and the Funds specifically authorizes

PI to "enter into a subadvisory agreement with . . . Jennison Associates LLC, or any other

subadviser, whether or not affiliated with the Manager (each, a Subadviser), pursuant to which

such Subadviser shall furnish to the Fund the investment advisory services in connection with the

management of the Fund (each, a Subadvisory Agreement)."[58]  Under the Subadvisory

Agreements that PI entered into with respect to the Funds, PI directed the subadvisers to

"provide supervision of such portion of the Fund's investments as [PI] shall direct" and

"determine from time to time what investments and securities will be purchased, retained, sold or

loaned by the Fund, and what portion of the assets will be invested or held uninvested as cash"—

all "subject to the supervision of" PI.[59]  As Plaintiffs again ignore, each Subadvisory Agreement,

like each Management Agreement, reiterates that PI "shall continue to have responsibility for all

services to be provided to the Fund pursuant to the Management Agreement and . . . shall

oversee and review the Subadviser's performance of its duties."[60]

---

[58]    Growth Fund MA at 1; Mid-Cap Growth Fund MA at 1; Natural Resources Fund MA at 1; Equity Income Fund MA at 1; Global Real Estate Fund MA at 1.

[59]    Mid-Cap Growth Fund Subadvisory Agreement ("SA") at 1; Natural Resources Fund SA at 1; Equity Income Fund SA at 1; Global Real Estate Fund SA at 1; Short-Term Corp. Bond Fund SA at 1. *See* Growth Fund SA at 1 (similarly providing that the subadviser will "manage the investment operations of the Fund and the composition of the Fund's portfolio" subject to PI's supervision).  The Growth Fund Subadvisory Agreement, which Plaintiffs concede is "substantially the same" as the Subadvisory Agreements for the other Funds, Compl. ¶ 37 n.18, is attached as Ex. 8.  PI would be pleased to supply the Subadvisory Agreements for the other Funds at the Court's request.

[60]    Growth Fund SA at 3; Mid-Cap Growth Fund SA at 3; Natural Resources Fund SA at 3; Equity Income Fund SA at 4; Global Real Estate Fund SA at 4; Short-Term Corp. Bond Fund SA at 3.

### E.     The SEC's Approval Of PI's "Manager of Managers" Structure

Under the ICA, a fund's shareholders ordinarily must approve any subadvisory agreement on an annual basis.[61]  However, the SEC often exempts an adviser employing the "manager of managers" model from having to seek annual shareholder approval of the subadvisory agreement(s).  Indeed, as noted above, the SEC has issued more than 200 exemptive orders approving "manager of managers" structures without requiring shareholder approval of the subadvisory agreements.

PI first obtained an exemptive order from the SEC regarding its "manager of managers" structure in 1996.[62]  PI thereafter managed each of the Funds at issue (along with dozens of others) pursuant to the "manager of managers" model, without once being accused by the SEC or any fund shareholder of performing "next to no services for the Funds," as Plaintiffs here allege.

In November 2014, PI applied to the SEC for a new exemptive order, this time with regard to subadvisory agreements with its corporately-affiliated subadvisers.  In its application, PI appropriately noted both that "from the perspective of the shareholder, the role of the Sub-Advisors is substantially equivalent to the role of the individual portfolio managers employed by an investment adviser to a traditional investment company," and that the shareholders of the funds advised by PI already "expect [PI], subject to the review and approval of the applicable Board, to select the Sub-Advisors who are in the best position to achieve the Subadvised [funds'] investment objective."[63]

---

[61]     15 U.S.C. § 80a-15(a).

[62]     *In re Target Portfolio Trust Prudential Mut. Fund Mgmt., Inc.*, SEC Rel. No. IC-22215, 1996 WL 517229 (Sept. 11, 1996).  This exemptive order only pertained to PI's unaffiliated subadvisers.

[63]     *Advanced Series Trust et al. Notice of Application*, SEC Rel. No. IC-31342, 2014 WL 6601015, at *5 (Nov. 20, 2014).

Less than a month after PI submitted its application, the SEC approved it as "appropriate in the public interest and consistent with [both] the protection of investors and the purposes fairly intended by the policy and provisions of the [ICA]"—and thereby authorized PI to retain affiliated subadvisers (such as those who subadvise each of the Funds in suit) without requiring annual shareholder approval.[64]   The SEC Order makes clear that PI retains full responsibility for managing the Funds.  For example, the SEC Order requires that PI "provide general management services . . . including overall supervisory responsibility for the general management and investment of" the subadvised funds.[65]   The SEC Order also requires that PI (subject to the oversight of each Fund's Board of Trustees): (i) set the Fund's overall investment strategies; (ii) evaluate, select, and recommend subadvisers to manage all of a portion of the fund's assets; and (iii) implement procedures designed to ensure that each subadviser will comply with each fund's investment objective, policies and restrictions.[66]

Plaintiffs' Complaint contains no mention of the SEC Order or its important conditions.

## III.   THE INDEPENDENT TRUSTEES' REVIEW AND APPROVAL OF THE MANAGEMENT AGREEMENTS

### A.      The Funds' Independent Trustees And Their Independent Counsel

The Board of each of the six Funds consists of a supermajority of at least 70 percent independent trustees—a proportion far exceeding the ICA's independence requirement.   As set

---

[64]      *In re Advanced Series Trust et. al*, SEC Rel. No. IC-31377, 2014 WL 7166465, at *2 (Dec. 16, 2014).

[65]      *Advanced Series Trust et al. Notice of Application*, 2014 WL 6601015, at *7; *see In re Advanced Series Trust et al.*, 2014 WL 7166465, at *2 (granting PI's application "subject to the conditions contained in the application").

[66]      *Advanced Series Trust et al. Notice of Application*, 2014 WL 6601015, at *7.

forth in the Funds' public reports to their shareholders, the Funds' Independent Trustees are all extraordinarily qualified for their "watchdog" role on behalf of the Funds' shareholders[67]

- Ellen S. Alberding is the President and a Board Member of the Joyce Foundation, and serves as Vice Chair of the City Colleges of Chicago. Ms. Alberding has extensive experience in managing investments for pension funds and charitable organizations.

- Kevin J. Bannon served until May 2015 as Managing Director and until November 2013 as Chief Investment Officer of Highmount Capital LLC, a registered investment adviser. Prior to his employment with Highmount, Mr. Bannon was an Executive Vice President and Chief Investment Officer of Bank of New York Company. Mr. Bannon also served as President of the BNY Hamilton Family of Mutual Funds.

- Linda W. Bynoe is the President and Chief Executive Officer of Telemat Ltd., a management consulting firm. Ms. Bynoe is a director of Anixter International Inc., the Northern Trust Corporation, and Equity Residential, a residential real estate company.

- Keith F. Hartstein served as President and Chief Executive Officer of the John Hancock Funds prior to his retirement. Mr. Hartstein also is a member of the Governing Counsel of the Independent Directors Council, and previously served as Chairman of the Investment Company Institute's Sales Force Marketing Committee.

- Michael S. Hyland served as Senior Managing Director at Bear Stearns & Company and as a Global Partner at INVESCO. Mr. Hyland is a Chartered Financial Analyst.

- Douglas H. McCorkindale formerly served as Chairman, Chief Executive Officer, and President of Gannett Company Inc. Mr. McCorkindale also sits on the board of Lockheed Martin Corporation.[68]

- Stephen P. Munn is the former Chairman and Lead Director of Carlisle Companies Incorporated.[69]

---

[67]     *See* 2014 Growth Fund AR at 43-45; 2015 Global Real Estate Fund AR at 47-49 (Ex. 9); 2014 Equity Income Fund AR at 54-56; 2015 Mid-Cap Growth Fund AR at 48-49; 2014 Natural Resources Fund AR at 48-51; 2014 Short-Term Corp. Bond Fund AR at 80-82.

[68]     Mr. McCorkindale retired as a trustee effective December 31, 2014. *See, e.g.*, Prudential Investment Portfolios Inc. Statement of Additional Information ("SAI") at 34 (Nov. 25, 2015).

[69]     Mr. Munn retired as a trustee effective September 18, 2015. *Id.*

- James E. Quinn is the former President and Director of Tiffany & Company. Mr. Quinn currently serves as a Director of Mutual of America Capital Management Corporation, Deckers Outdoor Corporation, and Hofstra University.[70]

- Richard A. Redeker is a management consultant and Director of the Mutual Funds Directors Forum. He also serves as Chair of the Policy Steering Committee of the Independent Directors Counsel. Before his retirement, Mr. Redeker spent more than 40 years as a senior executive in the mutual fund industry.

- Robin B. Smith is the Chairman of the Board of Publishers Clearing House. She also serves as a board member of ADL Partner. Ms. Smith formerly served as a Director of BellSouth Corporation.[71]

- Stephen G. Stoneburn is the Chairman, President, and Chief Executive Officer of Quadrant Media Corporation.

Further, the Independent Trustees are advised by experienced independent counsel. Paul Dykstra, Paulita Pike and the law firm of Ropes & Gray have extensive experience in providing advice and counsel to the trustees of open-end investment companies subject to the ICA.[72]

**B.     The Independent Trustees Requested And Evaluated All Information Relevant To Their Approval Of The Management Agreements**

In accordance with Section 15(c) of the ICA, in June 2014, the Board of each of the Funds held their annual in-person meeting to consider whether to renew the respective Management Agreements and Subadvisory Agreements. In connection with their review of the Management Agreements, the Board considered extensive information received throughout the year relating to PI's services and the Funds' performance. They also specifically requested and received materials relating to the Management Agreements and the Subadvisory Agreements, had the opportunity to ask questions and request further information in connection with their

---

[70]     Mr. Quinn resigned as a trustee effective July 2, 2015. *Id.*

[71]     Ms. Smith retired as a trustee effective December 31, 2014. *Id.*

[72]     Biography of Paul Dykstra, Ropes & Gray LLP, https://www.ropesgray.com/biographies/d/paul-dykstra.aspx; Biography of Paulita Pike, Ropes & Gray LLP, https://www.ropesgray.com/biographies/p/paulita-pike.aspx.

18

consideration of the agreements, and were assisted in this process both by their independent counsel and industry consultants.

Solely by way of example, the Board requested and received the following information in connection with their review of the Management Agreements and the Subadvisory Agreements at issue in this lawsuit:

**Performance of the Funds**: To evaluate the Funds' performance, the Board requested and reviewed a comparison provided by Lipper.[73] Based on their review of the information provided by Lipper, the Board recognized that each Fund exhibited consistently strong performance relative to its benchmark and its peers:

- The Growth Fund, rated a "Silver" fund by Morningstar (another independent industry source), had outperformed its benchmark index over the one, three, five, and 10 year periods, and was ranked in the first quartile of its peer group (*i.e.*, the quartile showing the best performance) for each of those periods.[74]

- The Equity Income Fund had outperformed its benchmark index over the one, three, five, and ten year periods, and the Fund ranked in the top quartile for its category over the five year period.[75]

- The Short Term Corporate Bond Fund had outperformed its benchmark index over the one, three, five, and ten year periods and was in the top quartile of comparable funds for the ten year period.[76]

- The Global Real Estate Fund had outperformed its benchmark index for the three, five, and ten year periods, placing in the top quartile for comparable funds over the five and ten year periods.[77]

---

[73]     2014 Growth Fund AR at 52-53; 2014 Mid-Cap Growth Fund AR at 57-58; 2014 Natural Resources Fund AR at 57-58; 2014 Equity Income Fund at 63-64; Sept. 2014 Global Real Estate Fund SAR at 43-44; 2014 Short-Term Corp. Bond Fund AR at 88-89.

[74]     2014 Growth Fund AR at 53; *Prudential Jennison Growth Fund*, Morningstar, http://quotes.morningstar.com/chart/fund/chart?t=PJFAX&region=usa&culture=en_US (last visited Jan. 27, 2016).

[75]     2014 Equity Income Fund AR at 64.

[76]     2014 Short-Term Corp. Bond Fund AR at 89.

- The Mid-Cap Growth Fund's performance had been favorable long term, outperforming its benchmark index over the ten-year period and ranking in the top quartile for its comparison group for that period.[78]  The Board also noted information it received indicating that the Fund's performance had improved during the first quarter of 2015.[79]

- The Natural Resources Fund had achieved above-average long term performance, outperforming its benchmark index over the five and ten year periods and placing in the top quartile of comparable funds over the ten year period and the second quartile for the five year period.[80]  The Board also noted it received information that the Fund ranked in the first quartile of peer funds and outperformed its benchmark for the one-year period ended April 30, 2014.[81]

**Fees and Expenses**: The Board evaluated both the Funds' actual management fees and net total expense ratios.  They also considered comparisons conducted by Lipper between the management fees paid by the Funds and those paid by other mutual fund clients of PI, as well as comparisons between the Funds' fees and those charged by other advisers to comparable funds.[82]  The Board noted that the Funds' management fees were generally low in comparison to the Funds' peer groups:

- Both the management fee and the net total expense for the Mid-Cap Growth Fund, the Natural Resources Fund, the Global Real Estate Fund, and the Short Term Corporate Bond Fund ranked in the first quartile for their respective peer groups (the quartile representing funds with the lowest fees in the group).[83]

- The Growth Fund's management fee and net total expense both ranked in the second quartile for its fund category.[84]

---

[77]   Sept. 2014 Global Real Estate Fund SAR at 44.  The Fund placed in the second quartile over the one and three year periods.  *Id.*

[78]   2015 Mid-Cap Growth Fund AR at 58.

[79]   *Id.*

[80]   2014 Natural Resources Fund AR at 58.

[81]   *Id.*

[82]   *E.g.*, 2014 Growth Fund AR at 52-53.

[83]   2015 Mid-Cap Growth Fund AR at 58; 2014 Natural Resources Fund AR at 58; 2014 Global Real Estate Fund SAR at 44; 2014 Short Term Corp. Bond Fund AR at 89.

[84]   2014 Growth Fund AR at 53.

- The Equity Income Fund's management fees were below the median for its Morningstar category.[85]  Even so, in 2014, the Board negotiated, and PI agreed to, three additional breakpoints (at the $5 billion, $7.5 billion, and $10 billion levels), thereby further reducing the advisory fees paid by the Fund's shareholders to PI.[86]

Based on this information, the Board concluded that PI's management fees (including the portion of the fee paid to subadvisers) and total expenses were reasonable in light of the services provided.[87]

**Nature, Quality, and Extent of Services**: The Board evaluated the services that PI rendered to the Funds, including but not limited to oversight of the subadvisers for the Fund, fund recordkeeping, compliance, and paying the salaries of all of the officers and non-independent directors of the Fund.[88]  The Board noted that PI has a business unit devoted to monitoring and reporting the subadvisers' performance and operations.[89]  The Board also considered the subadvisory services provided by the subadvisers subject to PI's oversight, PI's and the subadvisers' adherence to the Fund's investment policies, PI's evaluation of the subadvisers, and the favorable compliance reports from each Fund's Chief Compliance Officer regarding PI and each subadviser.[90]

---

[85]     *Prudential Jennison Equity Income Fund*, Morningstar, http://financials.morningstar.com/fund/expense.html?t=SPQAX&region=usa&culture=en-US (last visited Jan. 27, 2016).

[86]     2014 Equity Income Fund AR at 64.  These breakpoints are in addition to the four existing contractual management fee breakpoints on asset levels between $500 million and $5 billion.  *Id.*

[87]     2014 Growth Fund AR at 53; 2014 Mid-Cap Growth Fund AR at 58; 2014 Natural Resources Fund AR at 58; 2014 Equity Income Fund at 64; Sept. 2014 Global Real Estate Fund SAR at 44; 2014 Short-Term Corp. Bond Fund AR at 89.

[88]     2014 Growth Fund AR at 50-51; 2014 Mid-Cap Growth Fund AR at 55-56; 2014 Natural Resources Fund AR at 55-56; 2014 Equity Income Fund at 61-62; Sept. 2014 Global Real Estate Fund SAR at 41-42; 2014 Short-Term Corp. Bond Fund AR at 86-87.

[89]     *Id.*

[90]     *Id.*

Based on this review, the Board concluded that it was satisfied with the nature, extent and quality of the investment management services that PI and each Fund's subadviser provided, and that there was a reasonable basis on which to conclude that each Fund benefitted from both entities' services under the management and subadvisory agreements.[91]

**Costs of Services and Profits Realized**: The Board inquired about and considered separately the cost of services and profits realized by both PI and each Fund's subadviser. The Board also analyzed the methodology that PI used in assembling the information regarding profitability and the reasonableness of this methodology. The Board concluded that the profitability of PI and its affiliates in relation to the services rendered was not unreasonable.[92]

**Economies of Scale**: Several months before the June 2014 meeting to consider approval of the Management Agreements, PI and the Funds' Board retained an outside business consulting firm to review management fee breakpoint usage and trends in management fees across the mutual fund industry.[93] With regard to the Growth Fund, the Mid-Cap Growth Fund, the Natural Resources Fund, and the Equity Income Fund, the Board noted that the Funds' management fee schedules incorporated breakpoints and that the Board had received and discussed information concerning whether PI realizes economies of scale as the Fund's assets grow beyond current levels.[94] The Board took further note that the Funds' fee structures result in benefits to the Funds whether or not PI realizes any economies of scale.[95] With respect to the Equity Income Fund,

---

[91]     *Id.*

[92]     *Id.*

[93]     *E.g.*, 2014 Growth Fund AR at 51.

[94]     *Id.*; 2014 Mid-Cap Growth Fund AR at 56; 2014 Natural Resources Fund AR at 56; 2014 Equity Income Fund AR at 62-63.

[95]     *Id.*

the Board further noted PI's agreement to implement three additional breakpoints in the Fund's fee schedule.[96]

As concerns the Global Real Estate Fund, the Board concluded that in light of the Fund's current size, performance, and expense structure, the absence of breakpoints in the Fund's fee schedule was acceptable.[97]  For the Short-Term Corporate Bond Fund, the Board noted that it had negotiated the implementation of a breakpoint in the management fee schedule going forward.[98]

\* \* \* \* \*

As explained to the Funds' shareholders in reports made by each Fund to the SEC and disseminated to the Funds' shareholders, the Board (consisting of a supermajority of Independent Trustees) concluded at the end of this in-depth process and in view of the foregoing information that the continuation of the Management Agreements and the Subadvisory Agreements—*i.e.*, the same agreements upon which Plaintiffs premise their Complaint—was in the best interests of each Fund and its shareholders.[99]  In so doing, the Board respected the choice of the Funds' thousands of shareholders to have their investments managed by PI.  These shareholders have the right to "vote with their feet" by redeeming their investments, yet they have freely invested in the Funds with full disclosure of PI's advisory fee and its retention of subadvisers.

---

[96]     2014 Equity Income Fund AR at 35, 63-64; Equity Income Fund Supplement to SAI (June 20, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1035018/000006759014000695/jennequity497.htm.

[97]     Sept. 2014 Global Real Estate Fund SAR at 42.

[98]     2014 Short-Term Corp. Bond Fund AR at 89.  The Board also noted that the Fund's fee structure would benefit the Fund when (and if) assets reach the levels at which the fee rate is reduced, and further noted that these benefits will accrue whether or not PI is then realizing economies of scale. *Id.*

[99]     2014 Growth Fund AR at 53; 2014 Mid-Cap Growth Fund AR at 58; 2014 Natural Resources Fund AR at 58; 2014 Equity Income Fund AR at 64; Sept. 2014 Global Real Estate Fund SAR at 44; 2014 Short-Term Corp. Bond Fund AR at 89.

## THE STANDARD ON THIS MOTION

To state a claim that will survive a motion to dismiss, "[a] complaint must contain 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"[100]  "Facial plausibility exists 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"[101]  Although a court considering a motion to dismiss "must accept as true all factual allegations in the complaint, this principle does not apply to legal conclusions couched as factual allegations."[102]  Moreover, the Supreme Court's decisions in *Twombly*[103] and *Iqbal*[104] now "require that complaints in civil actions be alleged with greater specificity than previously was required."[105]  Thus, "[t]hreadbare recitals of the elements of a cause of action supported by mere conclusory statements" are no longer sufficient to state a claim.[106]  Rather, a "complaint must contain [f]actual allegations [sufficient] to raise a right to relief above the speculative level."[107]

Notably, the Fourth Circuit's controlling authority on Section 36(b), *Migdal v. Rowe-Price Fleming Int'l, Inc.*, affirmed the Rule 12(b)(6) dismissal of a complaint no less conclusory than Plaintiffs' under the more lenient pre-*Twombly* pleading standard.[108]  In so ruling, the Fourth Circuit recognized that even in the context of a Section 36(b) claim, Rule 12(b)(6) "serves

---

[100]   *Sloan v. Maryland Div. of Corr.*, No. CIV.A JKB-14-1396, 2015 WL 300407, at *1 (D. Md. Jan. 21, 2015) (Bredar. J.) (quoting *Iqbal*, 556 U.S. at 678).

[101]   *Id.* (quoting *Iqbal*, 556 U.S. at 678).

[102]   *Id.*

[103]   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

[104]   *Iqbal*, 556 U.S. 662

[105]   *Watson v. Stouffer*, No. CIV.A. JKB-13-3605, 2015 WL 412041, at *1 (D. Md. Jan. 29, 2015) (Bredar, J.) (granting motion to dismiss with prejudice).

[106]   *Iqbal*, 556 U.S. at 678.

[107]   *McCleary-Evans v. Maryland Dept. of Transp.*, 780 F.3d 582, 585 (4th Cir. 2015).

[108]   248 F.3d 321 (4th Cir. 2001).

to prevent costly discovery on claims with no underlying factual or legal basis."[109]  As the panel

warned, "plaintiffs cannot simply promise the court that once they have completed discovery,

something will turn up."[110]

## ARGUMENT

**I.  PLAINTIFFS FALL WELL SHORT OF STATING A VIABLE SECTION 36(B) CLAIM UNDER THE STRINGENT *JONES* STANDARD**

Congress and the Supreme Court have imposed a heavy burden on plaintiffs seeking to

overturn the Independent Trustees' business judgment in approving advisory fees.  Although

Section 36(b) imposes a fiduciary duty on investment advisers "with respect to the receipt of

compensation for services,"[111]  Congress created a "narrowly circumscribed right of action for

damages."[112]  Thus, Section 36(b) (i) places the burden of proving the breach of fiduciary duty

on the plaintiff, (ii) limits the potential recovery to the amount of allegedly excessive fees (*i.e.*,

no lost profits or consequential damages), and (iii) limits the period of retroactive recovery to the

one year prior to the filing of the complaint.[113]  Indeed, "Congress was concerned with nuisance

or strike suits," and it therefore "sought to protect the industry from the threat of such suits" by

maintaining "a careful balance between the interest in enabling shareholders to police investment

advisory fees and the interest in minimizing nuisance litigation."[114]

Section 36(b) thus represents a "delicate compromise" in which Congress provided

shareholders with a narrow private right of action to challenge allegedly excessive fees, but not

---

[109]      *Id.* at 326.

[110]      *Id.* at 328.

[111]      15 U.S.C. § 80a-35(b).

[112]      *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F. Supp. 1038, 1067 (S.D.N.Y. 1981), *aff'd*, 694 F.2d 923 (2d Cir. 1982).

[113]      *See Gartenberg*, 528 F. Supp. at 1044 n.6, 1067; 15 U.S.C. § 80a-35(b)(3).

[114]      *Krinsk v. Fund Asset Mgmt., Inc.*, 1986 WL 205, at *4 (S.D.N.Y. May 9, 1986).

with an unfettered right to seek judicial rate regulation under the guise of a "reasonableness" standard.[115]  Instead, as explained by the Supreme Court in *Jones*, Section 36(b) liability can arise <u>only</u> where an adviser charges "a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."[116]  Courts have recognized that the Section 36(b) standard is "a very high hurdle to overcome" for plaintiffs.[117]

### A.    Plaintiffs Must Plausibly Allege Both The Arm's Length Bargaining Range For PI's Advisory Fees And That PI's Fees Fall Outside That Range

The Supreme Court has instructed that "Section 36(b) is sharply focused on the question of whether the fees themselves were excessive ."[118]  This determination is not to be made in a vacuum.  Rather, the court must consider all relevant circumstances, the most important of which are whether the adviser's fee "was comparable to that produced by bargaining at other mutual-fund complexes" and whether the subject fund's performance "did as well as, of not better than, comparable funds."[119]  As the Seventh Circuit aptly observed in interpreting the Supreme Court's ruling on remand in *Jones II*, the fees paid by comparable mutual funds "tells us the bargaining range" under the *Jones* standard within which the fees cannot be deemed excessive, and a mutual fund's performance "shows that [the investment adviser] delivered value for money[.]"[120]  In this vein, *Jones II* also reinforces that "the goal is to identify the outer bounds of arm's-length

---

[115]     *Jones I*, 559 U.S. at 340-41.

[116]     *Id.* at 346.

[117]     *E.g.*, *Am. Mut. Funds*, 2009 WL 5215755, at *3.

[118]     *Jones I*, 559 U.S. at 352 (quoting *Migdal*, 248 F.3d at 328).

[119]     *Jones II*, 611 F. App'x at 3661.

[120]     *Id.* at 361; *see also Amron*, 464 F.3d at 345.

bargaining and not engage in rate regulation."[121]  Thus, to state a claim that PI's advisory fees are excessive under Section 36(b), Plaintiffs must allege, at a minimum, (i) that the advisory fees paid by the Funds were higher than those for comparable funds, and (ii) that the Funds did not perform as well as comparable funds.

The "*Gartenberg*" factors previously enumerated by the Second Circuit over 30 years ago are consistent with the Seventh Circuit's recent guidance in *Jones II*.  In addition to the two factors that the Seventh Circuit found dispositive in *Jones II*, the *Gartenberg* factors supply a non-exhaustive list of items a court might consider in addition.[122]  But as a rubric for review, the *Gartenberg* factors neither establish the Section 36(b) standard nor equate to the elements of a Section 36(b) claim.  Rather, the question under *Jones* remains: do the allegations credibly create a plausible inference that the fee is beyond what an arm's-length negotiation could possibly produce?  A complaint that fails to meet this standard fails to state a Section 36(b) claim.

### B.  Plaintiffs Make No Allegations That PI's Fees Are Outside The Range Of Arm's-Length Bargaining

Plaintiffs make no allegations identifying the Funds' comparable funds, nor do they allege how PI's fees or the Funds' performance compare to those of comparable funds.  Plaintiffs therefore fail to allege that PI's fees are outside the range that "arm's-length bargaining" could have produced.  This failure is fatal to their Section 36(b) claim against PI.

### 1.  Plaintiffs Fail To Make Any Fee Comparisons Establishing the Arm's-Length Bargaining Range For PI's Fees

Plaintiffs' Complaint is completely devoid of any allegations regarding how PI's fees compare to those paid by comparable funds (or any funds) for services of the type that PI provides (or indeed for any services).  Instead of comparing PI's fees to the fees that advisers

---

[121]     *Jones II*, 611 F. App'x at 360.

[122]     *See Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 929-32 (2d Cir. 1982).

offering similar services charge comparable funds, Plaintiffs proffer a comparison to the fees charged by the Funds' subadvisers.[123]   Yet this comparison ignores that the Funds' subadvisers provide only a portion of the services PI provides to the Funds, while PI shoulders the entire legal, regulatory, and reputational risks associated with managing the Funds.  Plaintiffs cannot meet their burden with this legally inapt comparison, which no court has ever accepted on the merits.[124]  Consequently, Plaintiffs have failed to allege what constitutes the relevant "bargaining range" for PI's fees, and without that range the Court has no basis on which it can draw a plausible inference that PI's fees fall outside it.[125]

Plaintiffs' silence in this regard, while conspicuous, is unsurprising in light of the indisputable facts of which this Court should take judicial notice.  As set forth above and explained to Plaintiffs and the Funds' other shareholders in the Funds' SEC filings, PI's fees for managing these Funds are below—and in most instances well below—the advisory fees charged to comparable funds.  Indeed: (i) PI's management fees for the Mid-Cap Growth Fund, the Natural Resources Fund, the Global Real Estate Fund, and the Short Term Corporate Bond Fund are all within the lowest quartile among their respective peer groups of funds; (ii) PI's management fee for the Growth Fund is within the second lowest quartile within its peer group

---

[123]    Compl. ¶ 44.  Moreover, although PI need not refute this assertion to prevail on its motion to dismiss, Plaintiffs' assertion will be shown to be completely wrong should this case proceed.  As an initial matter, Plaintiffs ignore critical differences between the services provided and risks assumed by an adviser as opposed to a subadviser.  Furthermore, because PI and the subadvisers are under common corporate ownership, the relative fee split between them is no more than a function of an internal cost allocation among business units.

[124]    *See, e.g., Jones II*, 611 F. App'x at 361 (comparison to mutual fund); *Amron*, 464 F.3d at 345 (same); *see also Jones I*, 559 U.S. at 350 (warning that "courts must be wary of inapt comparisons.").

[125]    *Accord Turner*, 2015 WL 5692324 (affirming dismissal of Section 36(b) claim that failed to set forth facts relating to the fees paid and performance achieved by comparable mutual funds); *see also Strougo v. BEA Assocs.*, 188 F. Supp. 2d 373, 384 (S.D.N.Y. 2002) (dismissing Section 36(b) claim on summary judgment where plaintiff "ha[d] not submitted evidence to dispute [the adviser's] showing that the Fund's fees and expenses are within the range of fees and expenses for similar funds.").

of funds; and (iii) PI's management fee for the Equity Income Fund is below the median for its

peer group of funds—and, in 2014, PI agreed to reduce this fee even further.[126]  These publicly-

disclosed comparisons are the product of analysis by a leading independent service, Lipper, not

PI.  Plaintiffs cannot ignore these critical facts yet still state a Section 36(b) claim.

### 2.  Plaintiffs Fail To Plead Any Facts Regarding the Funds' Performance In Comparison to Peer Funds

Although a fund's underperformance alone does not show that an adviser's services are

of poor quality,[127] as the Seventh Circuit noted in *Jones II*, a fund's relatively good performance

does "show[] that [the investment adviser] delivered value for money . . . ."[128]  Courts have noted

that "[o]ne of the most important measures of the nature and quality of advisory services

provided to mutual fund shareholders is the fund's performance relative to other funds of the

same kind."[129]  Thus, a fund's performance in relation to comparable funds is a factor that courts

look to when evaluating whether an advisory fee is excessive under Section 36(b).  Indeed, the

Second Circuit affirmed the dismissal of a Section 36(b) complaint that "fail[ed] to allege that

the Fund's performance is appreciably worse than comparable funds."[130]

---

[126]    2015 Mid-Cap Growth Fund AR at 58; 2014 Natural Resources Fund AR at 58; 2014 Global Real Estate Fund SAR at 44; 2014 Short Term Corp. Bond Fund AR at 89; 2014 Growth Fund AR at 53; 2014 Equity Income Fund AR at 64; *Prudential Jennison Equity Income Fund*, Morningstar, http://financials.morningstar.com/fund/expense.html?t=SPQAX&region=usa&culture=en_US (last visited Jan 28, 2016).

[127]    *Migdal*, 248 F.3d at 327-28.

[128]    *Jones II*, 611 F. App'x at 361 (concluding that the investment adviser's services were valuable where "the funds it was advising did as well as, if not better than, comparable funds.").

[129]    *Am. Mut. Funds*, 2009 WL 5215755, at *48 (citation and quotation omitted); *see also Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1229 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991) ("Given investors' primary objective of making money, the most significant indication of the quality of an investment adviser's services is the fund's performance relative to other funds of the same kind."); *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989) (analyzing fund's performance relative to comparable funds in concluding that "the services provided by Merrill Lynch have been only of the highest quality.")

[130]    *Amron*, 464 F.3d at 344.

Plaintiffs here fail to make any credible allegation regarding the Funds' performance.

Plaintiffs vaguely contend that five of the six Funds underperformed unspecified "primary

benchmarks" for the most recently reported fiscal year as of the filing of the Complaint.[131]  Not

only does this bald allegation say nothing about how any of the Funds performed relative to their

peer group of funds, or even define the "primary benchmarks" Plaintiffs intend to reference, but

it is demonstrably inaccurate.  As again explained to the Funds' shareholders in the Funds' SEC

filings:

- The Growth Fund had outperformed its benchmark index over the one, three, five, and ten year periods, and was ranked in the top quartile of its peer group for each of those periods.[132]

- The Equity Income Fund had outperformed its benchmark index over the one, three, five, and ten year periods, and the Fund ranked in the top quartile for its category over the five year period.[133]

- The Short Term Corporate Bond Fund had outperformed its benchmark index over the one, three, five, and ten year periods and was in the top quartile of comparable funds for the ten year period.[134]

- The Global Real Estate Fund had outperformed its benchmark index for the three, five, and ten year periods, placing in the top quartile for comparable funds over the five and ten year periods and in the second quartile over the one and three year periods.[135]

- The Natural Resources Fund had achieved above-average long term performance, outperforming its benchmark index over the five and ten year periods and placing in the top quartile of comparable funds over the ten year period and the second quartile for the five year period.[136]

---

[131]    *See* Compl. ¶ 72.  As of the filing of the Complaint, the most recently reported fiscal year was 2015 for the Real Estate Fund and 2014 for the other Funds.  *Id.* ¶ 3 n.8.

[132]    2014 Growth Fund AR at 53.

[133]    2014 Equity Income Fund AR at 64.

[134]    2014 Short-Term Corp. Bond Fund AR at 89.

[135]    Sept. 2014 Global Real Estate Fund SAR at 44.

[136]    2014 Natural Resources Fund AR at 58.  The Fund also ranked in the first quartile of peer funds and outperformed its benchmark for the one-year period ended April 30, 2014.  *Id.*

- The Mid-Cap Growth Fund's performance had been favorable long term, outperforming its benchmark index over the ten year period and ranking in the top quartile for its comparison group for that period.[137]

Plaintiffs' conclusory allegation of the Funds' underperformance is therefore not only implausible, but it strains the bounds of good faith. Certainly, it provides no basis for a Section 36(b) claim against PI under *Jones*.

### C.    Plaintiffs' Structural Attack On The "Manager Of Managers" Model Neither States A Section 36(b) Claim Nor Relieves Plaintiffs From The Requirement Of Satisfying The *Jones* Standard

Plaintiffs wholly ignore their burden to plead facts showing that PI's fees are "outside the range that arm's-length bargaining would produce," as *Jones* requires.[138] Instead, Plaintiffs attempt a sleight of hand by substituting an attack on the "manager of managers" structure utilized by PI to provide investment advisory services to the Fund. However, their criticisms of the structure of PI's investment platform—a structure in which Plaintiffs freely invested—cannot substitute for well-pled factual allegations demonstrating that PI's fees are excessive under *Jones*. In fact, courts have rejected plaintiffs' Section 36(b) claims despite the fact that an investment adviser retained third parties in rendering services to the funds.[139] Plaintiffs' failure to make any allegations that would establish the "arm's-length" range for PI's fees dooms their Section 36(b) claim as a matter of law, irrespective of their purported aversion to an investment model that PI has successfully utilized for the benefit of Plaintiffs and the rest of the Funds' shareholders for almost two decades.

---

[137]    2015 Mid-Cap Growth Fund AR at 58. The Fund's performance improved during the first quarter of 2015. *Id.*

[138]    *Jones I*, 559 U.S. at 347.

[139]    *E.g.*, *Kalish*, 742 F. Supp. at 1228-29 (rejecting Section 36(b) claim where "the principal function that [the adviser] performed was a back-office type of function" because adviser retained third parties for securities selection).

Plaintiffs' theory that the "manager of managers" structure somehow inherently violates Section 36(b) ignores that this structure is entirely legal, is widely utilized in the industry, and has been specifically approved by the SEC on more than 200 separate occasions. Indeed, it was just over one year ago when the SEC re-confirmed its explicit approval of PI's use of this structure. In so doing, the SEC reiterated its requirement that PI (and not the subadvisers) "provide general management services . . . including overall supervisory responsibility for the general management and investment of" the subadvised funds.[140] In addition, not only did the SEC grant PI permission "to enter into and materially amend subadvisory agreements with [both] non-affiliated sub-advisors and wholly-owned sub-advisors without shareholder approval," but it even exempted PI from having to disclose the fees paid to subadvisers.[141] In other words, the SEC approved PI's use of the same "manager of managers" model that Plaintiffs now attack and deemed immaterial to shareholders the very framework of this Complaint: how much of the advisory fee is paid to the subadvisers versus how much PI retains. Tellingly, Plaintiffs' Complaint fails even to acknowledge the SEC Order or any of its terms.

Plaintiffs further ignore that their theory finds no support in the language of Section 36(b) itself. Section 36(b) requires consideration of "all services rendered . . . and all compensation and payments received."[142] Nothing in Section 36(b) permits a Plaintiff to state a claim based on a challenge to only an isolated portion of the fee relative to only a subset of the overall services provided to the Funds. Indeed, because fund investors "purchase a bundle of services" that are

---

[140]   *Advanced Series Trust et al. Notice of Application*, 2014 WL 6601015, at *7.

[141]   *Id.*

[142]   S. Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4910.

provided to the fund,[143] it would be illogical to conclude that Section 36(b) permits a cause of action based on merely a portion of the total fee paid for that bundle.

Nevertheless, Plaintiffs undoubtedly will point to the decisions denying motions to dismiss a recent series of "manager of managers" complaints that Plaintiffs' outside counsel and their cohorts have filed across the country over the past few years as potential grounds for the present complaint to proceed into costly and time-consuming discovery.[144] These nonbinding and distinguishable decisions should not sway this Court's evaluation of Plaintiffs' Complaint. Indeed, Plaintiffs' Complaint contains a number of fatal flaws not present in the complaints in those cases. For instance, Plaintiffs here willfully ignore not only key provisions from the Management and Subadvisory Agreements, but also the entirety of the SEC exemptive order expressly approving of PI's "manager of managers" model and reinforcing PI's duties and responsibilities notwithstanding its retention of subadvisers. Furthermore, none of those other courts was asked to consider the *Jones II* decision, which stands for the inarguable proposition that below-average advisory fees charged by an adviser who delivers above-average performance—such as PI—cannot be found "excessive" under Section 36(b).

Plaintiffs' baseless attack on the legal, accepted and successful "manager of managers" platform does not excuse their failure to plead any facts that would establish the "bargaining range" for PI's fees. Plaintiffs therefore have not pled a claim that satisfies *Jones*.

---

[143]     *Am. Mut. Funds*, 2009 WL 5215755, at *30.

[144]     *Redus-Tarchis v. New York Life Inv. Mgmt., LLC*, 2015 WL 6525894 (D.N.J. Oct. 28, 2015); *Curd v. SEI Invs. Mgmt. Corp.*, 2015 WL 4243495 (E.D. Pa. July 14, 2015); *Zehrer v. Harbor Capital Advisors, Inc.*, 2014 WL 6478054 (N.D. Ill. Nov. 18, 2014); *Am. Chem & Equip. Inc. 401(K) Ret. Plan v. Principal Mgmt. Corp.*, 2014 WL 5426908 (S.D. Iowa Sept. 10, 2014); *Kasilag v. Hartford Inv. Fin. Servs. LLC*, 2012 WL 6568409 (D.N.J. Dec. 17, 2012).

**D.    Plaintiffs' Remaining Allegations Are Equally Deficient**

Plaintiffs' remaining allegations regarding PI's fees, which largely consist of rote

invocation of several *Gartenberg* factors, are equally insufficient to "nudge[] their claims across

the line from conceivable to plausible."[145]

> **1.    Plaintiffs' Allegation That PI Performed "Next To No Services" For The Funds Is Demonstrably False**

In lieu of facts about the actual nature of the many services that PI performs for the Funds

under the Management Agreements, the core premise of Plaintiffs' Complaint is that PI

"performed next to no services" for the Funds in return for its compensation under the

Management Agreements while "delegat[ing] substantially all of the investment management

services to the Sub-advisers."[146]  Yet the very Management Agreements and Subadvisory

Agreements upon which the Complaint relies demonstrate that Plaintiffs' core premise is false.

As a result, it should be rejected at the outset.[147]

As the Complaint concedes, PI carries out a number of important responsibilities under

the Management Agreements, including "manag[ing] the investment operations" of the Funds

"in accordance with the Funds' investment objectives," "determin[ing] from time to time what

investments or securities will be purchased, retained, sold or loaned," and performing

administrative services.[148]  Plaintiffs further concede that PI selects each of the Sub-advisers and

undertakes the "supervision and oversight of the Sub-advisers."[149]

---

[145]    *Twombly*, 550 U.S at 570.

[146]    *E.g.*, Compl. ¶¶ 3, 44. *Accord id.* ¶¶ 35-52.

[147]    *See Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (a court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit.") (citation omitted).

[148]    Compl. ¶¶ 26-27.

[149]    *Id.* ¶¶ 35-37, 52.

Beyond Plaintiffs' partial acknowledgment of PI's responsibilities in the Complaint, the

Management Agreements and Subadvisory Agreements on which Plaintiffs rely categorically

refute Plaintiffs' allegation that PI performed "next to no services" for the Funds.  For example,

each of the Management Agreements states clearly and unambiguously that "The Manager [*i.e.*,

PI] will continue to have responsibility for all investment advisory services furnished pursuant to

any Subadvisory Agreement."[150]  Each Subadvisory Agreement also expressly states that PI

"shall continue to have responsibility for all services to be provided to the Fund pursuant to the

Management Agreement and . . . shall oversee and review the Subadviser's performance of its

duties."[151]  Nowhere in the Complaint are these dispositive provisions of the Agreements cited.

In addition to ignoring critical parts of the Management and Subadvisory Agreements

that would eradicate the theory of their Complaint, Plaintiffs mischaracterize the language of

both sets of Agreements.  Indeed, they excerpt a small section of each Agreement and then

conclude that PI's services are "near identical" to those of the subadvisers.[152]  These selective

allegations ignore the numerous and crucial differences between the responsibilities that PI

shoulders and those the subadvisers undertake.  A facial comparison of the Management

Agreements and Subadvisory Agreements shows a number of duties that PI bears exclusively.

For instance, only PI is charged with retaining subadvisers and allocating assets among the

subadvisers.[153]  Once PI has retained a subadviser, only PI has the duty to:

- "continually evaluate the performance of the Subadviser . . . through quantitative and qualitative analysis and consultations with such Subadviser";

---

[150]     *E.g.*, Growth Fund MA at 1.

[151]     *E.g.*, Growth Fund SA at 3.

[152]     Compl. ¶ 37.

[153]     *E.g.*, Growth Fund MA at 1.

- "periodically make recommendations to the Fund's Board as to whether the contract with one or more Subadvisers should be renewed, modified, or terminated"; and

- "periodically report to the Fund's Board regarding the results of its evaluation and monitoring functions."[154]

Beyond these exclusive duties regarding the subadvisers, PI is also solely responsible for paying "the salaries and expenses of all employees of the Fund and the Manager. . . and costs of providing office facilities."[155]

These responsibilities unique to PI underscore that PI alone, not any subadviser, is accountable for all of the Funds and their performance across the board. PI bears all of the business risks attendant with launching and managing a mutual fund in an ever-competitive investment environment. Moreover, PI alone bears the ultimate legal and regulatory risk of managing the Funds, including that it can be held legally responsible for actions attributable entirely to the subadvisers.[156] It is therefore not a coincidence that the SEC's 2014 exemptive Order requires that PI, *inter alia*, retain "overall supervisory responsibility for the general management and investment of" the subadvised funds."[157] Given that PI retains full responsibility for overseeing and managing the Funds, the SEC's Order confirms that it is legally immaterial whether PI discharges that responsibility by directly selecting securities for the Funds or by engaging an affiliated entity to provide those services under its supervision.

The Complaint trumpets the pre-filing investigation of Plaintiffs' counsel, and it specifically references their "review of documents filed with the U.S. Securities and Exchange

---

[154]   *Id.*

[155]   Compl. ¶ 47.

[156]   *See In re Virtus*, 2015 WL 7179719; *In re Morgan Stanley*, 2011 WL 5562535.

[157]   *Advanced Series Trust et al. Notice of Application*, 2014 WL 6601015, at *7.

Commission and other public information."[158]  Yet, the Complaint neglects to mention that those

very "documents" and "other public information"—*e.g.*, the Management Agreements, the

Subadvisory Agreements, the Funds' SEC filings, the SEC Order—make absolutely clear that (a)

PI provides <u>significant</u> services to the Funds under the Management Agreements, and (b) none of

PI's responsibilities to the Funds under those Management Agreements is altered or discharged

by PI's use of subadvisers.  Plaintiffs cannot wish away the indisputable facts in publicly-filed

SEC materials that undercut their sparse factual allegations, which in any event do not state a

claim under *Jones*.

> **2.**     **Plaintiffs Make No Allegations At All Regarding The Quality Of PI's Services**

Plaintiffs do not (and cannot) allege that the quality of PI's services was poor or that PI

neglected any of its many duties under the Management Agreements.  These omissions are

important, because in the absence of any factual allegations challenging the quality of services

provided by PI, Plaintiffs cannot plausibly contend that PI's fees for performing those services

were excessive.[159]

> **3.**     **Plaintiffs Make No Plausible Allegations That PI's Profitability Resulted In Excessive Fees**

In enacting Section 36(b), Congress made clear that "the investment adviser is entitled to

make a profit," and that "[n]othing in the bill is intended to imply otherwise."[160]  Yet Plaintiffs

do not even attempt to make a particularized allegation that PI's fees are excessive due to the

---

[158]     Compl. preamble at 1.

[159]     *Migdal*, 248 F.3d at 327 (dismissing complaint that "failed to allege any facts pertinent to th[e] relationship between fees and services").

[160]     S. Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4902. *Accord Krinsk*, 715 F. Supp. at 502 n.61 (observing that high profitability alone does not support a finding that the advisory fee is excessive); *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 573 F. Supp. 1293, 1316 (S.D.N.Y. 1983) ("[The adviser] and its affiliates are entitled to recoup their costs and to make a fair profit without having to fear that they have violated Section 36(b).").

level of profitability that PI generates from performing under the Management Agreements.

Instead, Plaintiffs speculate that PI must have earned untoward profits because, according to

Plaintiffs, PI retained a disproportionate amount of the management fee relative to the "next to

no services" it allegedly performed.[161]  As set forth in Point I.D.1 above, this contention is

demonstrably wrong and therefore provides no basis for any Section 36(b) claim.

Even if there were something to Plaintiffs' concocted assertion, Plaintiffs still have failed

to make an allegation that PI's profitability was excessive because the Complaint contains no

allegations at all regarding the actual costs PI incurred in providing services to the Funds

including, at a minimum, exercising oversight over the services the subadvisers provided to the

Funds.  Plaintiffs' conclusory allegations regarding PI's profitability are therefore legally

insufficient to support a Section 36(b) claim.[162]

### 4.    Plaintiffs' Conclusory "Economies Of Scale" Allegations Are Legally Deficient

The fact that the Funds have increased in size over time is a sign of the excellent

performance and low fees offered by the Funds, which has led additional investors to place their

money with PI.  Plaintiffs' perverse attempt to use the Funds' success against PI must fail, for

they cannot show the existence of any economies of scale that were not shared with investors.

To demonstrate that PI enjoyed "economies of scale" that were not shared with the

Fund's shareholders, Plaintiffs must, as a threshold matter, allege facts that make plausible the

inference that PI actually realized any economies of scale.[163]  Allegations regarding an increase

---

[161]    *E.g.*, Compl. ¶¶ 4, 44, 54.

[162]    *E.g.*, *Kalish*, 742 F. Supp. at 1237 (ruling that an allegation that the investment adviser "just plain made too much money" could not support a 36(b) claim).

[163]    *See id.* at 1239 ("Economies of scale do not exist in a vacuum. The concept is meaningful only if increased size of a fund . . . directly reduces the manager's costs of processing each transaction and servicing each shareholder.  A plaintiff must prove that the fund actually realized such economies of

in a fund's assets under management ("AUM") are alone insufficient to establish the existence of economies of scale.[164] Although Plaintiffs allege that the Funds' AUM increased and that PI's costs of providing services decreased as a percentage of the AUM, they rely wholly on speculation in suggesting that PI's responsibilities have not "meaningfully" increased as the Funds' AUM has grown.[165] Because the Complaint fails to allege "the costs of performing fund transactions or the relationship between such costs and the number of transactions performed,"[166] Plaintiffs have not plausibly alleged the existence of economies of scale.[167]

Moreover, even if the existence of economies of scale could be inferred on the basis of Plaintiffs' threadbare allegations, Plaintiffs still fail to allege facts showing that any such economies were not shared with the Funds' investors. "Economies of scale can be shared with fund shareholders in a number of ways, including breakpoints . . . fee reductions and waivers . . . offering low fees from inception . . . or making additional investments to enhance shareholder services."[168] Here, the fee schedules for five of the six Funds already incorporate breakpoints, which lower the advisory fee paid by the Fund as the Fund grows in size.[169] And, to the extent

---

scale."); *In re Scudder Mut. Funds Fee Litig.*, 2007 WL 2325862, at *16 (S.D.N.Y. Aug. 14, 2007) (granting motion to dismiss because, *inter alia*, "Plaintiffs do not explain how, but merely presume that, economies of scale were achieved.").

[164]    *See Gartenberg*, 528 F. Supp. at 1055; *Kalish*, 742 F .Supp. at 1238; *In re Goldman Sachs Mut. Funds*, 2006 WL 126772, at *9 (S.D.N.Y. Jan. 16, 2006).

[165]    Compl. ¶¶ 57-60.

[166]    *Amron*, 464 F.3d at 345.

[167]    *See Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 540 (S.D.N.Y. 2008) (holding that without information regarding "the actual transaction costs at issue and whether the costs per investor increased or decreased as the assets under management grew .... there is no way to determine whether any economy of scale even existed that could have been passed on to investors").

[168]    *Am. Mut. Funds*, 2009 WL 5215755, at *52.

[169]    While the Real Estate Fund's fee schedule does not include breakpoints, the Fund's Board specifically considered the absence of breakpoints when determining whether to approve the Management Agreement. The Board "recognized the inherent limitations of any analysis of economies of scale, stemming largely from the Board's understanding that most of PI's costs are not specific to any individual

that Plaintiffs quibble with the placement of those breakpoints,[170] the Court should reject such

quibbles as "not sufficient to establish a failure to pass along economies of scale since the

allegation does not address the Defendants' alleged increase in economies of scale but merely the

compensation structure of the fund as originally set."[171]

## II.   PLAINTIFFS OFFER NO BASIS TO OVERTURN THE INDEPENDENT TRUSTEES' BUSINESS JUDGMENT IN APPROVING THE FUNDS' MANAGEMENT AGREEMENTS WITH PI

There is yet another compelling basis to dismiss Plaintiffs' Complaint:  Plaintiffs have

offered no reason to upset the Independent Trustees' business judgment in approving the

Management Agreements as "in the best interest of the Fund[s] and [their] shareholders."[172]

### A.   Plaintiffs Seeking To Overturn The Independent Trustees' Business Judgment Bear A Heavy Burden

The ICA mandates that "approval by the board of directors of such investment company

of such compensation or payments . . . _shall_ be given such consideration by the court as is

deemed appropriate under all the circumstances."[173]  Thus, in judging the sufficiency of a

complaint under Section 36(b), a court must not lightly set aside the business judgment of the

independent trustees—who the ICA entrusts with protecting mutual fund investors—that the

---

funds, but rather are incurred across a variety of products and services," and concluded that "[i]n light of the Fund's current size, performance and expense structure, . . . the absence of breakpoints in the Fund's fee schedule is acceptable at this time."  Sept. 2014 Global Real Estate Fund SAR at 42.

[170]   Compl. ¶¶ 63, 67, 70.

[171]   _Hoffman_, 591 F. Supp. 2d at 540.

[172]   2014 Growth Fund AR at 53; 2014 Mid-Cap Growth Fund AR at 58; 2014 Natural Resources Fund AR at 58; 2014 Equity Income Fund AR at 64; Sept. 2014 Global Real Estate Fund SAR at 44; 2014 Short-Term Corp. Bond Fund AR at 89.

[173]   15 U.S.C. § 80a-35(b)(2) (emphasis added).

challenged fees are appropriate.[174]   Accordingly, as the Supreme Court explained, "the standard for fiduciary breach under § 36(b) does <u>not</u> call for judicial second-guessing of informed board decisions."[175]   Hence, "[w]here a board's process for negotiating and reviewing investment adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process.  Thus, if the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to <u>considerable weight</u>, even if a court might weigh the factors differently."[176]

The detailed and deliberative process in which the Independent Trustees engaged with respect to their consideration of the Management Agreements—including their review of independently-prepared information demonstrating that PI's fees are lower than comparable funds and the Funds' performance exceeds that of the comparable funds—is described in the Funds' filings with the SEC and distributed to Plaintiffs and all of the Funds shareholders.

The Supreme Court has admonished that the informed business judgment reached by independent trustees in approving a management agreement is entitled to "considerable weight" and should not be the subject of "judicial second-guessing."[177]   Accordingly, as required by *Jones*, the Independent Trustees' business judgment with respect to PI's fees is entitled to "considerable weight."  In the absence of any factual allegations showing that the fees charged by PI are beyond the "outer bounds" of what could have been bargained at arm's-length, that "considerable weight" further dooms Plaintiffs' claim.

---

[174]   *See* S. Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4903 (1970) ("[Section 36(b)] is not intended to shift the responsibility for managing a [mutual fund] in the best interest of its shareholders from the directors of such [mutual fund] to the judiciary.").

[175]   *Jones I*, 559 U.S. at 352 (emphasis added).

[176]   *Id.* at 351 (emphasis added).

[177]   *Id.*

**B.   Plaintiffs Do Not Plausibly Challenge The Statutory Independence Of The Funds' Independent Trustees**

More than 70% of each Fund's Board is "independent" under the ICA, and is therefore statutorily presumed to be independent.[178]  Plaintiffs do not even attempt to allege otherwise, nor could they.  Instead, they offer a series of conclusory attacks on the Independent Trustees' independence that can quickly be rejected.

For example, Plaintiffs charge that all of the Independent Trustees were "dominated and unduly influenced" by PI, yet their sole support for this charge is that the Trustees' compensation and continuation in their roles are "at least partially dependent" on PI's continued good will.[179]  This charge has repeatedly been rejected as legally insufficient to challenge the independence of a fund's statutorily-presumed independent trustees, even at the pleadings stage.[180]  Indeed, as Judge Davis explained in granting the motion to dismiss in *Migdal*, "proof that the disinterested directors had even a significant financial incentive to curry favor with the funds and their investment advisers would not sustain a claim under [section] 36(b); *a fortiori*, therefore, such allegations do not state a claim under [section] 36(b)."[181]

The remainder of Plaintiffs' attacks on the Independent Trustees' supposed lack of independence amount to the contention that, because the Trustees approved the Investment

---

[178]   15 U.S.C. § 80a-2(a)(19); *see Amron*, 464 F.3d at 344 ("the 40 Act contains an express presumption that mutual fund trustees and natural persons who do not own 25% of the voting securities are disinterested").

[179]   Compl. ¶ 77.

[180]   *E.g., Amron*, 464 F.3d at 345 (allegations regarding compensation received by fund directors are "insufficient as a matter of law" to allege lack of director independence and conscientiousness); *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 305 F.3d 140, 142-44 (3d Cir. 2002) (affirming rejection of allegations that directors were not independent because "they serve on numerous other boards for various Prudential funds and receive a large aggregate compensation for their combined services"); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 240 (S.D.N.Y. 2005) ("The fact that a defendant appointed a board member is insufficient to establish that the board member is interested, even if the position provides the board member with compensation.").

[181]   2000 WL 350400, at *3 (D. Md. Mar. 20, 2000).

Advisory Agreement, they must therefore not be independent.[182] This quintessentially circular argument "do[es] not go beyond asserting that the Trustees had approved transactions that are alleged to have been wrongful," and not only ignores the statutory presumption of independence accorded to the Fund's Independent Trustees, but also has been repeatedly rejected.[183]

### C.   Plaintiffs Also Fail To Plausibly Allege That The Independent Trustees' Review Was Not Rigorous and Thorough

Plaintiffs also fail to plead any facts plausibly suggesting that the Board's process was anything other than thorough and robust.  Rather, Plaintiffs merely re-deploy the circular argument that the process must have been infirm because, after all, the Trustees approved the Management Agreements.  In service of that assertion, they again make the same tired allegations that have been routinely rejected in other cases.

For instance, Plaintiffs assert that the Board could not have been acting conscientiously when it approved PI's advisory fees because the Funds purportedly underperformed their primary benchmarks for certain periods.[184]  Not only is this assertion about the Funds' performance demonstrably false,[185] but it proves far too much; if accepted, it would mean that

---

[182]    Compl. ¶ 73.

[183]    *See In re AllianceBernstein Mut. Fund Excessive Fee Litig.,* 2006 WL 74439, at *3 (S.D.N.Y. Jan. 11, 2006) (rejecting "claims that fail to unambiguously demonstrate director domination by an investment adviser"); *ING Principal Prot. Funds Derivative Litig.,* 369 F. Supp. 2d 163, 172 (D. Mass. 2005) ("Simply because the Board of Trustees approved the fee contracts at issue does not render the independent trustees 'interested.'"); *Hoffman,* 591 F. Supp. 2d at 540-41 (express presumption of director independence not overcome by claims that fail to allege specific facts as to why a board member would lack independence).

[184]    Compl. ¶ 72.

[185]    *See* Part I.B.2, *supra.*

trustees for every fund that has experienced a period of below-benchmark performance are not acting conscientiously in approving an unchanged advisory fee.[186]

Plaintiffs next assert that the Funds' respective Boards had to have "rubber-stamped" the Management Agreements[187]—and this, according to Plaintiffs, is because the Boards had the same members, had the same oversight responsibilities for each Fund, and met four times in one year for all of the Prudential funds.[188] This allegation has also been consistently and squarely rejected. As the Fourth Circuit observed in *Migdal*, "neither the ICA nor the SEC proscribes the use of multi-board membership within mutual fund complexes," and "membership on the boards of several funds within a mutual fund complex is the prevailing practice in the industry."[189]

Plaintiffs next contend that the Independent Trustees' business judgment cannot be credited because they relied on information provided by PI.[190] Of all of the unfounded allegations in Plaintiffs' Complaint, this one is among the most reckless. Plaintiffs inexplicably ignore that the Supreme Court in *Jones* recognized that Section 15(c) of the ICA itself expressly requires both the Independent Trustees to request from PI "all information 'reasonably . . . necessary to evaluate the terms' of the adviser's contract" and for PI to provide that information to the Independent Trustees.[191] Therefore, as the Fourth Circuit explained, "[o]ne would expect

---

[186] *See Migdal*, 248 F.3d at 327-28 ("An under-achieving fund one year may be an overachieving fund the next"); *Amron*, 464 F.3d at 344 (holding that "allegations of underperformance alone are insufficient to prove that an investment adviser's fees are excessive").

[187] Compl. ¶ 72.

[188] *Id.* ¶ 73.

[189] *Migdal*, 248 F.3d at 330. *Accord Migdal*, 2000 WL 350400, at *3 (refusing to "credit as a factual allegation, as contrasted with permissible legal argument, the contention that the limits of human capacity for useful work and independent judgment is exceeded by service on more than 30 fund boards"); *Verkouteren v. Blackrock Fin. Mgmt., Inc.*, 1999 WL 511411, at *2-3 (S.D.N.Y. July 20, 1999) (rejecting allegation that directors served on so many boards that they could not devote attention to each).

[190] Compl. ¶ 74.

[191] *Jones I*, 559 U.S. at 348 (citing 15 U.S.C. § 80a-15(c)) (ellipses in original).

any conscientious director to request information from management and staff on the day-to-day operations for which they are responsible. The ICA itself approves this very practice."[192]

In a last-ditch effort to impugn the Boards' thorough process, Plaintiffs aver that the Boards would not have approved the Management Agreements if they had obtained "information or analyses reflecting the interests of the Funds or their security holders with respect to the investment advisory fees or critically assessing Defendant's rationalization for those fees."[193] This averment does nothing to support Plaintiffs' claim. To begin with, it is completely conclusory and circular. In essence, Plaintiffs work backwards—they claim that, because PI's advisory fees were allegedly excessive, the Boards' process must have been flawed. But if this allegation suffices, then every plaintiff could call into question the process of every board in the country by simply disagreeing with the board's ultimate conclusion. A plaintiff could nullify a rigorous board process without alleging a single fact about the independence of the board, the materials the board reviewed, or the expertise of the board members. Such a result would be directly at odds with the ICA's statutory scheme, which both gives significant deference to the board and is designed to protect advisers from ill-founded suits.[194]

Moreover, the Complaint does not identify any pertinent information that the Boards supposedly did not receive.[195] Rather, it suggests that the Boards did not receive "appropriate

---

[192]   *Migdal*, 248 F.3d at 331.

[193]   Compl. ¶ 75.

[194]   *See In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d 677, 687 (D.N.J. 2007) (allowing plaintiffs to state a Section 36(b) claim based on allegations that could apply to a significant portion of mutual fund complexes would "violate a stated intent of the drafters of the 1970 amendments [to the ICA], which was to 'prevent the harassment of investment advisors by ill-founded or nuisance law suits, the so-called strike suit.'") (quoting H.R. Rep. No. 1382, 91st Cong., 2d Sess., 8 (1970)).

[195]   Plaintiffs' sole allegation in this regard claims that the Board did not consider "fee rates negotiated by other mutual funds." Compl. ¶ 76. This claim is proven false by the very disclosures on which the Complaint relies. *See* 2014 Growth Fund AR at 52; 2014 Mid-Cap Growth Fund AR at 57;

information"—whatever that means—because the Boards approved the Management

Agreements.  Yet the Boards requested—and PI was statutorily compelled to furnish—"such

information as may reasonably be necessary to evaluate the terms of" the Management

Agreements.[196]  This statutory power places the Boards in an even better position than in a

typical arm's-length transaction, when parties are free to withhold relevant information.

Even more troubling, Plaintiffs' insinuation that the Independent Trustees did not

consider all relevant information is contrary to the Funds' publicly-filed documents, which

describe in detail the type of information that the Independent Trustees reviewed when

considering approval of the Management Agreements, including:

- The level of advisory fees that PI charges the Funds compared with the fees charged to comparable mutual funds (which information was collected and provided by unaffiliated third party Lipper);

- The Funds' overall fees and operating expenses compared with similar mutual funds (also provided by Lipper);

- The Funds' performance compared to similar mutual funds;

- The quality and sophistication of PI's investment management and other services; and

- The level of PI's profitability from its Fund-related operations.[197]

\*    \*    \*    \*    \*

Plaintiffs' allegations regarding the Funds' Boards are devoid of facts, contrary to the

public documents, and circular.  As such, they fail to legitimately call into question the

independence of the Independent Trustees or their conscientiousness in reviewing and approving

---

2014 Natural Resources Fund AR at 57; 2014 Equity Income Fund AR at 63; Sept. 2014 Global Real Estate Fund SAR at 43; 2014 Short-Term Corp. Bond Fund AR at 88.

[196]   15 U.S.C. § 80a-15(c).

[197]   2014 Growth Fund AR at 49-50; 2014 Mid-Cap Growth Fund AR at 54-55; 2014 Natural Resources Fund AR at 54-55; 2014 Equity Income Fund AR at 6-61; Sept. 2014 Global Real Estate Fund SAR at 40-41; 2014 Short-Term Corp. Bond Fund AR at 85-86.

PI's fees.  Therefore, "considerable weight" should be given to the Independent Trustees'

business judgment approving the Funds' fee arrangements with PI.  And without any factual

allegations showing that the fee charged by PI is beyond what could have been bargained at

arm's-length, that "considerable weight" provides further reason for the Court to dismiss

Plaintiffs' claim.

## CONCLUSION

Plaintiffs ask this Court to ignore the proven benefits PI has achieved for the Funds'

shareholders, to disregard the fact that PI's fees are lower than those charged by advisers to

similar funds, and to overlook the considered business judgment of the Funds' Independent

Trustees in approving PI's Management Agreements with the Funds.  Yet they utterly fail to set

forth well-pled facts sufficient to satisfy the stringent pleading requirements required by the

Supreme Court.  Consequently, Plaintiffs' Complaint should be dismissed in its entirety and with

prejudice.

Dated:  January 29, 2016

Respectfully Submitted,

_____*/s/*_____

**KRAMON & GRAHAM, P.A.**
Geoffrey H. Genth, Bar No. 08735
William J. Harrington, Bar No. 03863
One South Street
Suite 2600
Baltimore, MD  21202
ggenth@kg-law.com
wharrington@kg-law.com
Tel.: (410) 752-6030
Fax: (410) 539-1269

**DECHERT LLP**
Matthew L. Larrabee (admitted *pro hac vice*)
David A. Kotler (admitted *pro hac vice*)
Deborah Kemi Martin (admitted *pro hac vice*)
Catherine V. Wigglesworth (admitted *pro hac vice*)
1095 Avenue of the Americas
New York, NY  10036-6797
matthew.larrabee@dechert.com
david.kotler@dechert.com
deborahkemi.martin@dechert.com
catherine.wigglesworth@dechert.com
Tel.: (212) 698-3500
Fax: (212) 698-3599

*Attorneys for Defendant Prudential Investments*
*LLC*