## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|                                        |   |                          |
|----------------------------------------|---|--------------------------|
|                                        | * |                          |
| **NORTH VALLEY GI MEDICAL GROUP,** *et al.*, | * |                          |
|        **Plaintiffs**                  | * |                          |
|        **v.**                          | * |   **CIVIL NO.  JKB-15-3268** |
| **PRUDENTIAL INVESTMENTS LLC,**        | * |                          |
|        **Defendant**                   | * |                          |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM  AND  ORDER

Pending before the Court are Defendant's motion to dismiss for failure to state a claim (ECF No. 26) and Defendant's motion to strike jury demand (ECF No. 27).  The latter motion has not been opposed by Plaintiffs (ECF No. 36) and will be granted.  The motion to dismiss has been briefed (ECF Nos. 35, 39), and no hearing is required, Local Rule 105.6 (D. Md. 2016).  It will be denied.  The Court also will deny Plaintiffs' motion for leave to file a surreply (ECF No. 40) as untimely inasmuch as it was filed seven weeks after Defendant's reply.

Before addressing the merits of Defendant's motion to dismiss, the Court cautions both parties to observe certain rules as to the format of motion papers.  First, the parties' motion papers employed a method of citation of authorities that is not only incompatible with the rules but also a hindrance to the Court's consideration of the parties' respective arguments.  For documents filed in this Court, the Local Rules neither permit nor require the citation of authorities in footnotes, as opposed to incorporating them into the text of documents.  *See The Bluebook:  A Uniform System of Citation* R. B1.1, at 3 (Columbia Law Review Ass'n *et al.* eds., 20th ed. 2015) ("In non-academic legal documents, such as briefs and opinions, citations

generally appear within the text of the document immediately following the propositions they support.  Footnotes should only be used in non-academic legal documents when permitted or required by local court rules.").  Second, the former rule requiring attachment to motion papers of unpublished case opinions has been omitted from recent iterations of the Local Rules.  A citation to either Westlaw or LEXIS suffices for unpublished opinions.  Counsel should familiarize themselves with these rules.  Future noncompliant filings will be stricken without prior notice.

The Court turns now to the substance of Defendant's motion to dismiss.

## I.  Standard of Dismissal for Failure to State a Claim

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  An inference of a mere possibility of misconduct is not sufficient to support a plausible claim.  *Id.* at 679.  As the *Twombly* opinion stated, "Factual allegations must be enough to raise a right to relief above the speculative level."  550 U.S. at 555.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557).  Although when considering a motion to dismiss a court must accept as true all factual allegations in the complaint, this principle does not apply to legal conclusions couched as factual allegations.  *Twombly*, 550 U.S. at 555.

## II.  Allegations of the Complaint

Plaintiffs in this case are North Valley GI Medical Group, Christopher Evans, John Kernan, James and Karen Grugan, and Joseph Lipovich. Plaintiffs are investors in certain named mutual funds and are suing on behalf of those funds. (Compl. ¶¶ 1, 10-14, ECF No. 1.) The funds in question are the following:

- Prudential Jennison Growth Fund ("Growth Fund")

- Prudential Jennison Mid-Cap Growth Fund, Inc. ("Mid-Cap Fund")

- Prudential Global Real Estate Fund ("Real Estate Fund")

- Prudential Jennison Equity Income Fund ("Income Fund")

- Prudential Short-Term Corporate Bond Fund, Inc. ("Short-Term Fund") and

- Prudential Jennison Natural Resources Fund, Inc. ("Resources Fund").

Collectively, these are referred to as the "Funds." (*Id.* ¶ 1.)

Defendant Prudential Investments LLC launches and manages equity, fixed income, and balanced mutual funds. (*Id.* ¶ 21.) Defendant is the investment advisor to the Funds and receives an annual fee from each of the Funds for providing investment advisory services to each one. (*Id.* ¶ 2.) Plaintiffs allege the Defendant violated its statutory fiduciary duty with respect to these investment advisory fees paid by the Funds to Defendant. (*Id.* ¶ 2.) In particular, Plaintiffs allege that the investment advisory fees received by Defendant from each of the Funds are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendant and could not have been the product of arm's-length bargaining. (*Id.*) The complaint explains that Defendant delegates to investment subadvisors substantially all of Defendant's responsibilities for providing investment advisory services to the Funds while, at the same time, retaining over half of the advisory fees Defendant receives from the Funds. (*Id.* ¶ 3.) The rest of the fees not retained by Defendant are paid to the subadvisors, who, Plaintiffs allege,

are performing the vast majority of investment advisory services to the Funds.  (*Id.* ¶ 4.)  Other than for minimal oversight services actually performed by Defendant, Plaintiffs allege that most of the many millions of dollars Defendant receives in investment advisory service fees represent pure profits and not compensation for services rendered.  (*Id.* ¶¶ 3, 4.)  Additionally, Plaintiffs allege that Defendant further breached its fiduciary duty by failing to share with the Funds savings from economies of scale realized due to the considerable growth of the Funds since their inception.  (*Id.* ¶ 5.)  Rather, the significant increase in fees paid by each of the Funds as the Funds have grown larger has not been matched by a proportionate increase either in the services performed by Defendant or in the cost or quality of investment advisory services provided to the Funds.  (*Id.*)

The six Funds that are the subject of the complaint are in addition to fifty-two other mutual funds for which Defendant serves as the investment advisor.  Collectively, these fifty-eight mutual funds are referred to as the "Prudential Funds."  (*Id.* ¶ 24.)  In a September 2014 filing with the Securities and Exchange Commission ("SEC"), Defendant indicated it employs sixty-nine individuals to perform investment advisory services for all of the Prudential Funds, including the Funds at issue in this case.  (*Id.*)

Plaintiffs make specific allegations as to each of the Funds' growth in assets under management ("AUM") and fees charged.  They also compare Defendant's responsibilities, as set forth in the management agreements between the Funds and Defendant, with the subadvisors' responsibilities, as set forth in the management agreements between Defendant and the subadvisors.

The detailed allegations regarding the Growth Fund are illustrative of the detailed allegations regarding the other Funds.   Under Defendant's management agreement for the Growth Fund, Defendant's responsibilities include the following:

> ... [T]he Manager shall manage the investment operations of the [Fund] and the composition of the [Fund's] portfolio, including the purchase, retention and disposition thereof, in accordance with the [Fund's] investment objectives, policies and restrictions ... subject to the following understandings:
>
>> (a)      The Manager ... shall provide supervision of the [Fund's] investments and determine from time to time what investments or securities will be purchased, retained, sold or loaned by the [Fund], and what portion of the assets will be invested or held uninvested as cash.
>>
>> * * *
>>
>> (c)      The Manager ... shall determine the securities and futures contracts to be purchased or sold by the [Fund] and will place orders pursuant to its determinations with or through such persons, broker dealers or futures commission merchants (including but not limited to Prudential Securities Incorporated) in conformity with the policy with respect to brokerage as set forth in the Fund's Registration Statement or as the Board of Directors may direct from time to time.

(*Id.* ¶ 26.)

Certain administrative responsibilities are also conferred upon Defendant by its management agreement with the Funds:

> Subject to the supervision of the Board of Directors of the Fund, the Manager shall administer the Fund's business affairs and, in connection therewith, shall furnish the Fund with office facilities and with clerical, bookkeeping and recordkeeping services at such office facilities ... subject to the following understandings:
>
>> * * *
>>
>> (d)      The Manager ... shall maintain all books and records with respect to the [Fund's] portfolio transactions and shall render to the Fund's Board of Directors such periodic and special reports as the Board may reasonably request.

> (e)    The Manager ... shall be responsible for the financial and accounting records to be maintained by the [Fund] (including those being maintained by the Fund's Custodian).
>
> (f)    The Manager ... shall provide the Fund's Custodian on each business day information relating to all transactions concerning the [Fund's] assets.

(*Id.* ¶ 27.)

Since the Growth Fund's inception in 1995, Defendant has subcontracted with Jennison Associates LLC ("Jennison") to provide investment advisory services to the Growth Fund.  (*Id.* ¶ 35.)   Defendant's agreement with Jennison includes the following responsibilities to be performed by Jennison for the Growth Fund:

> ...the Subadviser shall manage the investment operations of the Fund and the composition of the Fund's portfolio, including the purchase, retention and disposition thereof, in accordance with the Fund's investment objectives, policies and restrictions ... subject to the following understandings:
>
> (i) The Subadviser shall provide supervision of the Fund's investments and determine from time to time what investments and securities will be purchased, retained, sold or loaned by the Fund, and what portion of the assets will be invested or held uninvested as cash.
>
> \* \* \*
>
> (iii) The Subadviser shall determine the securities and futures contracts to be purchased or sold by the Fund and will place orders with or through such persons, brokers, dealers or futures commission merchants ... to carry out the policy with respect to brokerage as set forth in the Fund's Registration Statement and Prospectus or as the Board of Directors may direct from time to time.

(*Id.* ¶ 37.)

In addition, Jennison is required to perform the following administrative services for the Growth Fund pursuant to its subadvisory management agreement with Defendant:

> (iv) The Subadvisor shall maintain all books and records with respect to the Fund's portfolio transactions ... and shall render to the Fund's Board of

6

> Directors such periodic and special reports as the Directors may reasonably request.
>
> (v) The Subadviser shall provide the Fund's Custodian on each business day with information relating to all transactions concerning the Fund's assets and shall provide the Manager with such information upon request of the Manager.

(*Id.* ¶ 51.)

Under the Funds' management agreements with Defendant, each of the Funds is required to pay Defendant an annual fee calculated as a percentage of that particular Fund's AUM. (*Id.* ¶ 28.) Defendant's annual fee due to it from the Growth Fund has been figured, since June 1, 2004, according to a breakpoint schedule; for AUM up to $300 million, the fee rate is 0.60%; for AUM up to $3 billion,[1] the fee rate is 0.575%; and for AUM over $3 billion, the fee rate is 0.55%. (*Id.* ¶ 29.) During fiscal year 2014, the Growth Fund paid Defendant approximately $15,155,667 in investment advisory fees. (*Id.*) Plaintiffs calculate this amount as an effective rate of 0.58% of AUM in the Growth Fund in 2014. (*Id.*)

Under the subadvisory management agreements between Defendant and the subadvisors, Defendant pays the subadvisors an annual fee that, Plaintiffs allege, amounts to roughly 50% of what Defendant charges the Funds as Defendant's fee "for the nearly identical services required of Defendant under" its management agreements with the Funds. (*Id.* ¶ 37.) During fiscal year 2014, Defendant paid a fee to Jennison for its work pursuant to their subadvisory management agreement for the Growth Fund according to a breakpoint schedule; for AUM up to $300 million, the fee rate was 0.30%; for AUM over $300 million, the fee rate was 0.25%. (*Id.* ¶ 38.) In the fiscal year ended September 30, 2014, Defendant paid Jennison approximately $6,706,812 for its services to the Growth Fund pursuant to the subadvisory management

---

[1] Presumably, this should be AUM over $300 million and up to $3 billion; otherwise, the fee would be calculated on the first $300 million twice. *See* Complaint ¶ 29 n.15 (indicating the fee rate of 0.60% is applied to the first $300 million and the fee rate of 0.575% is applied to $2.7 billion of the first $3 billion).

agreement.  (*Id.*)  Plaintiffs calculate this amount as an effective rate of 0.25% for fiscal
year 2014.  (*Id.*)

All told, figures for the most recent fiscal year available at the time of the filing of the
complaint show that the six Funds paid Defendant $201,743,012 in investment advisory fees.
(*Id.* ¶¶ 29-34.)  Similarly, during that same time, Defendant paid its subadvisors $96,026,414 for
their investment advisory services to the Funds.  (*Id.* ¶¶ 38-43.)

Defendant is affiliated with the subadvisors, but Plaintiffs allege the subadvisors have an
incentive to negotiate the highest possible fees for their services and, therefore, the negotiations
between Defendant and the subadvisors are effectively at arm's length.  (*Id.* ¶ 44.)  Plaintiffs
allege that, consequently, the fees negotiated by the subadvisors as reflected in the subadvisory
management agreements are indicative of the range of reasonable fees for the investment
advisory services required under Defendant's management agreements with the Funds.  (*Id.*)
Plaintiffs further allege that the subadvisors' fees include the subadvisors' cost of providing their
services plus a profit.  (*Id.*)  Because, Plaintiffs allege, Defendant performed almost no services
for the Funds, the fees retained by Defendant were mostly profit, which is further evidence of the
unreasonableness of Defendant's fees.  (*Id.*)

Plaintiffs also note that, in addition to paying Defendant's annual fees, the Funds pay for
most of the administrative costs associated with operating the Funds.  (*Id.* ¶ 45.)  These
administrative costs are incurred for, *inter alia*, investment and reinvestment of Fund assets;
nonaffiliated directors on the Funds' boards; the custodian of the Funds' records; the transfer and
dividend disbursing agent; legal counsel and independent accountants; brokers' commissions and
issue or transfer taxes; all taxes and fees paid to governmental agencies; trade association fees;
stock certificates representing shares of the Funds; fidelity, directors and officers, and errors and

omissions insurance; registration and maintenance of registration of the Funds with the SEC; registration of the Funds as brokers or dealers; notice filings under state securities' laws; communications expenses relating to investor services; shareholders' and directors' meetings; preparing, printing, and mailing reports to shareholders; litigation and indemnification expenses; and expenses assumed pursuant to a plan of distribution adopted in conformity with Rule 12b-1 of the Investment Company Act of 1940.  (*Id.*)

During fiscal year 2014, the Growth Fund paid more than $8.87 million in these administrative costs in addition to the $15,155,667 that the Growth Fund paid to Defendant in investment advisory fees.  (*Id.* ¶¶ 29, 46.)  Administrative expenses paid by all six Funds, according to the most recently available fiscal year figures, were $137,562,611.  (*Id.* ¶ 46.)

Plaintiffs allege the only identifiable expenses related to administration of the Funds' corporate affairs purportedly assumed by Defendant are (1) salaries and expenses of all employees of the Funds and of Defendant other than the fees and expenses of directors who are not affiliated persons of either the Defendant or any subadvisor and (2) costs of providing office facilities.  (*Id.* ¶ 47.)  "Only two or three members of each of the Funds' Boards . . . are affiliated, *i.e.*, interested persons."  (*Id.*)  The interested board members are also employees of Defendant and Defendant's affiliates, and they "devote a majority of their time to their responsibilities as employees of Defendant and its affiliates, and not to their responsibilities as directors or trustees of the Funds."  (*Id.* ¶ 48.)  According to the complaint, all fifty-eight Prudential Funds share ten common directors/trustees; fifty-six of the Prudential Funds (including the six Funds subject of the complaint) share an eleventh common director/trustee; thirty-seven of the Prudential Funds (including four of the Funds) share a twelfth common director/trustee; and thirty of the Prudential Funds (including four of the Funds) share a thirteenth and fourteenth common

director/trustee.  (*Id.* ¶ 24 n.12.)  Thus, Plaintiffs allege, "substantially the same Board oversees the Funds in addition to overseeing the fifty-two other Prudential Funds."  (*Id.* ¶ 24.)  All fifty-eight Prudential Funds share the same office space as Defendant and its affiliates.  (*Id.* ¶ 50.) Plaintiffs allege that Defendant's purported expenses related to the Funds' directors/trustees, other employees, and office space "are de minimis and do not justify the mark-up charged by Defendant to the Funds."  (*Id.* ¶ 47.)

Regarding Plaintiffs' contention as to economies of scale, Plaintiffs allege that considerable growth in the Funds' AUM has resulted in considerable growth in Defendant's advisory fees.  (*Id.* ¶ 56.)  Over the five years preceding the filing of the complaint, the Growth Fund's AUM increased from approximately $1.8 billion in 2009 to approximately $2.7 billion in 2014.  (*Id.*)  Similarly, Defendant's advisory fees paid by the Growth Fund grew from $9,417,378 in 2009 to $15,155,667 in 2014.  (*Id.*)  For all six Funds, AUM increased over that time period from approximately $6.259 billion to approximately $35.1 billion.  (*Id.*)  Likewise, Defendant's advisory fees paid by the Funds grew from $40,274,619 in 2009 to $201,743,012 in 2014.  (*Id.*)

Plaintiffs allege that Defendant realized economies of scale as the Funds' AUM increased, which reduced the cost of providing services to each Fund, when figured as a percentage of AUM.  (*Id.* ¶ 57.)  However, Plaintiffs allege that the increase in Defendant's advisory fees has not been accompanied by a proportionate increase in either the work or the cost required for Defendant to provide the investment advisory services mandated by the Funds' management agreements.  (*Id.*)  For each Fund, Defendant has continued to subcontract with only one subadvisor; no additional subadvisors have been retained.  (*Id.* ¶ 58.)  Defendant's supervision and oversight of the Funds' subadvisors have not meaningfully increased as AUM

has increased.  (*Id.*)  Defendant continues to request and review the same or nearly the same reports regardless of AUM.  (*Id.*)  The cost or work involved in Defendant's monitoring to ensure regulatory compliance relating to the Funds has not increased in proportion to the increase in AUM.  (*Id.*)  The same is true as to "the minimal administrative-type services purportedly provided pursuant to the Management Agreements."  (*Id.*)  Defendant did not share with the Funds the benefits of economies of scale (*id.* ¶ 61); instead, "the benefits of economies of scale accrue[d] to [the Funds'] investment adviser in the form of higher fees and profits" (*id.* ¶ 60).

Plaintiffs allege Defendant's lack of care and conscientiousness in its negotiation of its advisory fees to be paid by the Funds is further evidence of its breach of fiduciary duty to the Funds.  (*Id.* ¶ 72.)  Despite the foregoing circumstances alleged by Plaintiffs, the Funds' boards "have consistently rubber-stamped the Management Agreements, including the investment advisory fee rates."  (*Id.*)  Moreover, the boards approved Defendant's investment advisory fees despite underperformance in relation to the Funds' primary benchmarks.  (*Id.* ¶ 72.)  Thus, the boards have not devoted the time and attention necessary to assess, independently, Defendant's fees "or to effectively represent the interests of Fund security holders vis-à-vis Defendant." (*Id.* ¶ 73.)  The boards do not hold separate meetings for each Fund; in calendar year 2014, the boards met a total of four times for the fifty-eight Prudential Funds.  (*Id.*)  "[T]he Boards have inexplicably accepted Defendant's representations that the fee is justified by Defendant's supervision and oversight of the Sub-advisers and assumption of limited administrative costs." (*Id.* ¶ 74.)  "Defendant has not provided, and the Board has not considered, appropriate information about the value of the supervision and oversight services provided by Defendant to the Funds, the cost to Defendant of providing such services, the economies of scale realized by Defendant in providing such services, or the costs to Defendant for providing employees and

office space." (*Id.* ¶ 75.)  Nor, Plaintiffs allege, has Defendant provided to the boards or have the

boards considered information about the work of the subadvisors, and their negotiated fees, in

providing "all the investment advisory services to the Funds for less than half price."  (*Id.* ¶ 76.)

> Plaintiffs also allege that the nonaffiliated directors/trustees
>
> are in all practical respects dominated and unduly influenced by Defendant in
> reviewing the fees.   The directors/trustees' continuation in the role of an
> "independent" director/trustee from year-to-year, and the compensation they earn,
> is at least partially dependent on the continued good will and support of
> Defendant and the interested directors.

(*Id.* ¶ 77.)  Finally, Plaintiffs allege,

> The investment advisory fees are paid out of each Fund's assets.  Each dollar in
> fees paid by a Fund directly reduces the value of the Fund's investment portfolio.
> Therefore, the payment of excessive investment advisory fees to Defendant harms
> each of the Funds on a going forward basis because each Fund loses investment
> returns and profits it could earn on the amounts paid out as fees if those amounts
> remained in the Fund's portfolio and available for investment.  Indeed, each Fund
> has sustained millions of dollars in damages due to the excessive investment
> advisory fees paid to Defendant.

(*Id.* ¶ 78.)


## III.  *Applicable Law*

Under section 36(b) of the Investment Company Act of 1940, codified at 15 U.S.C.

§ 80a-35(b), "the investment adviser of a registered investment company shall be deemed to

have a fiduciary duty with respect to the receipt of compensation for services, or of payments of

a material nature, paid by such registered investment company or by the security holders thereof,

to such investment adviser or any affiliated person of such investment adviser."  Plaintiffs are

permitted to sue, on behalf of the mutual funds, the investment advisor of the security in which

they hold shares for the advisor's breach of a fiduciary duty.  *Id.*  If successful, Plaintiffs may

recover "actual damages resulting from [the breach] . . . [not to] exceed the amount of

compensation or payments received" by the investment advisor.  *Id.* subsec. (b)(3).  The action

may not be brought against any person other than the recipient of the compensation, and no award of damages is recoverable for any period prior to one year before the complaint was filed. *Id.* Approval by the board of directors of the compensation for, contracts with, and other arrangements with the investment advisor "shall be given such consideration by the court as is deemed appropriate under all the circumstances." *Id.* subsec. (b)(2).

> The Supreme Court has opined,

> To face liability under § 36(b), an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.

*Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 346 (2010). The *Jones* Court relied substantially on a Second Circuit decision in fashioning criteria for analyzing the issue of what a shareholder plaintiff must prove in order to show that an investment advisor breached its fiduciary duty under section 36(b). *Id.* at 353 ("The *Gartenberg* standard . . . may lack sharp analytical clarity, but we believe that it accurately reflects the compromise that is embodied in § 36(b) . . . ." (referring to *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir. 1982))). In particular, the Supreme Court noted, under *Gartenberg*, that all relevant circumstances must be taken into account, and that "*Gartenberg* uses the range of fees that might result from arm's-length bargaining as the benchmark for reviewing challenged fees." *Id.* at 347. The Court eschewed "any categorical rule regarding the comparisons of the fees charged different types of clients," *id.* at 349, and cautioned against relying "too heavily on comparisons with fees charged to mutual funds by other advisers. These comparisons are problematic because these fees, like those challenged, may not be the product of negotiations conducted at arm's length," *id.* at 350-51. The appropriate measure of deference to a board's judgment in approving an investment advisor's compensation varies according to the circumstances. *Id.* at 349.

> Where a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process. Thus, if the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently. This is not to deny that a fee may be excessive even if it was negotiated by a board in possession of all relevant information, but such a determination must be based on evidence that the fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."

*Id.* at 351 (citations omitted). The degree of compliance by an investment advisor with its obligations to make full disclosure to the governing board is a factor to be considered in measuring the degree of deference due to a board's decision to approve an advisor's fees. *Id.* at 352. Finally, the Court stated, "In reviewing compensation under § 36(b), the [Investment Company] Act does not require courts to engage in a precise calculation of fees representative of arm's-length bargaining." *Id.* at 352.

## IV. *Analysis*

Defendant has attacked Plaintiffs' complaint for three principal reasons: *First*, Defendant faults the complaint for failing to plead any facts about fees paid by comparable mutual funds; thus, according to Defendant, the complaint fails "to establish the bargaining range outside which [Defendant]'s fees can be deemed excessive." (Def.'s Mot. Dismiss 2, ECF No. 26.) *Second*, Defendant argues the complaint circumvents the Supreme Court's standard for making a viable section 36(b) claim by challenging Defendant's "manager of managers" structure, which is widely used and approved by the SEC. (*Id.*) *Third*, Defendant asserts that Plaintiffs have not set forth sufficient factual allegations "to overturn the Independent Trustees' business judgment." (*Id.*) Besides these arguments, Defendant also asserts that the facts controvert Plaintiffs' allegations. Defendant's arguments are without merit.

Defendant's first argument, that the complaint does not include any facts about fees paid by comparable mutual funds and, therefore, fails to establish the relevant bargaining range to evaluate whether Defendant's fees are excessive, misstates governing precedent.   Defendant quotes an unpublished Seventh Circuit opinion (following the Supreme Court's remand to the Seventh Circuit in *Jones*) indicating the most important of the relevant circumstances to be considered on the excessive-fee issue to be "whether the adviser's fee 'was comparable to that produced by bargaining at other mutual-fund complexes.'"   (Def.'s Mot. Supp. Mem. 26 (citing 611 F. App'x  359).)   Whatever the Seventh Circuit thinks in that regard is of no moment.   The Supreme Court's opinion, which is what governs this Court, clearly did not place great store in what other mutual funds paid in fees to their investment advisors. 559 U.S. at 350-51.   *Jones* does not require pleading of comparable fund fees in order to state a viable claim.   Nor is the *Jones* all-relevant-circumstances standard circumscribed by a particular method of proof, much less pleading.   Plaintiffs in the instant case have plausibly claimed that the true worth of the investment advisory services rendered to the Funds is appropriately measured by the arm's-length negotiation of the subadvisors' fees.   That is a reasonable basis for claiming Defendant's fees are excessive.   Any argument that Defendant's fees are in line with those charged for other mutual funds, or that the Funds' performance compared favorably to other mutual funds, is a fact-based argument inappropriate to this Court's consideration on a motion to dismiss for failure to state a claim.

Defendant's second argument, that Plaintiffs are improperly criticizing the "manager of managers" model, is misdirected.   Plaintiffs have not attacked that model.   What they are attacking is the amount of fees charged and retained by Defendant for serving as a manager of managers.   They plausibly allege Defendants are receiving fees for work that someone else

performs. That is an appropriate allegation. Whether the model is widely used or whether the SEC approves the model is immaterial to the Court's consideration. Further, whether Defendant is actually providing meaningful services for its fees—another contention made by Defendant (Def.'s Mot. Dismiss Supp. Mem. 34-36)—is a matter of factual dispute and cannot be resolved on a Rule 12(b)(6) motion.

Defendant's third argument, that Plaintiffs have not offered sufficient factual allegations to upset the independent directors/trustees' business judgment approving the management agreements including Defendant's fees, is unmeritorious. Building on the strength of their other allegations as to what entity or entities are actually performing the investment advisory services for the Funds, Plaintiffs' allegations allow a plausible inference either that a business judgment to approve unearned compensation for Defendant was not one based upon full information or that it was not reached through arm's-length negotiations between the Funds and Defendant. Whether either circumstance is the case or not is a matter of proof that cannot be decided at this juncture.

An additional argument is that Plaintiffs have not set forth sufficient allegations to support their contention as to economies of scale not being properly reflected in the fee structure. (*Id.* 38-40.) The Court concludes otherwise. Plaintiffs have plausibly alleged that Defendant's responsibilities have not increased in quality or quantity as AUM increased; thus, a plausible inference arises that an increase in fees is not justified. Again, this is not a question that can be decided definitively at the pleading stage.

*V.* *Conclusion*

After carefully reviewing Plaintiffs' complaint and considering Defendant's arguments, the Court concludes Defendant's motion to dismiss for failure to state a claim is without merit. Accordingly, IT IS HEREBY ORDERED:

1.  Defendant's motion to dismiss (ECF No. 26) IS DENIED.

2.  Defendant's unopposed motion to strike jury demand (ECF No. 27) IS GRANTED.

3.  Plaintiffs' motion for leave to file a surreply (ECF No 40) IS DENIED.

4.  Defendant shall answer the complaint in the time allowed under Rule 12(a)(4(A).

DATED this 23rd day of August, 2016.

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge